963 A.2d 443

**Rowena J. GBUR, Executrix of the Estate of Joseph Gbur, Jr., Deceased, and Rowena J. Gbur in her own Right, Appellees**

**v.**

**Anthony GOLIO, M.D., Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 8, 2008.

Decided Jan. 28, 2009.

Jeanette Hsin Ho, Louis C. Long, Pietragallo, Gordon, Alfano, Bosick & Raspanti, L.L.P., Pittsburgh, for Anthony Golio, M.D., appellant.

Robert B. Hoffman, WolfBlock, L.L.P., Harrisburg, for PA Medical Society, appellant amicus curiae.

Darryl R. Slimak, McQuade Blasko Law Offices, State College, for the PA Defense Institute, appellant amicus curiae.

Christopher C. Rulis, O'Brien, Rulus & Bochicchio, L.L.C., Pittsburgh, for Medical Care Availability and reduction of Error Fund, appellee.

Mark J. Homyak, Pittsburgh, for Rowena J. Gbur, appellee.

Raymond Michael Bily, Linda McGrier, Reiff & Bily, Philadelphia, for appellee amicus curiae.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD and GREENSPAN, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

Justice SAYLOR.

We allowed appeal to address the MCARE Act's same-subspecialty requirement pertaining to the admission of expert testimony to establish the standard of care in a medical malpractice action. Although the Court is unanimous as to the result, it is equally divided concerning the appropriate reasoning. This opinion, supported by three of six participating Justices, turns on issue preservation.

Appellant is a physician specializing in the field of urology. He is certified by the American Board of Urology. In 2001 through 2002, Appellant treated Appellee's decedent, Joseph Gbur, for prostate cancer. In March 2003, Mr. and Mrs. Gbur commenced a medical malpractice action against Appellant. Their theory of the case centered upon Appellant's receipt, in March 2001, of the results of a radiological bone scan, in which the radiologist reported as follows:

60

There are multiple foci of abnormal activity involving the right and left sides of the pelvis, the lower thoracic spine, right ribs, right mandible. The pattern is consistent with osseous metastatic disease. There are some areas of increased activity at the knees and in the cervical spine which may be degenerative in nature.

IMPRESSION

THERE ARE ABNORMAL AREAS OF ACTIVITY IDENTIFIED IN THE RIGHT MANDIBLE, RIGHT RIBS, LOWER THORACIC SPINE AND MULTIPLE FOCI IN THE PELVIS CONSISTENT WITH OSSEOUS METASTATIC DISEASE.

According to the Gburs, Appellant: discounted the scan and report without consulting the radiologist; did not advise Mr. Gbur of the results; and proceeded to embark upon an unnecessary course of treatment, including implantation of radioactive seeds in Mr. Gbur's prostate (brachytherapy), which would have been appropriate only for non-metastasized prostate cancer. In the meanwhile, the Gburs contended, Mr. Gbur reasonably did not understand that the severe pain he suffered in his jaw was due to the metastasis, since he was unaware of the results of the bone scan. Thus, the plaintiffs alleged, Mr. Gbur underwent an unnecessary course of dental procedures (including multiple root canals) and suffered needless pain, when his symptoms would have been appropriately addressed (and ultimately were addressed) by irradiation, had Mr. Gbur apprehended earlier that he suffered from metastasis.

In discovery, the Gburs produced the expert report of Shelby P. Sanford, M.D., a board-certified radiation oncologist, who opined that Appellant breached the governing medical standard of care by failing to evaluate the bone scan findings more thoroughly, discuss the findings with Mr. Gbur, and report the results to other treating physicians. Although Appellant could not have prevented Mr. Gbur's ultimate death (which occurred during the course of the legal proceedings), according to the report, Appellant's asserted failures resulted

in many unnecessary, aggressive surgical interventions and delayed appropriate palliative treatment.

Prior to trial, Appellant filed a motion to dismiss and a motion *in limine* challenging, among other things, Dr. Sanford's competence to express an opinion concerning the standard of care applicable in the practice of urology. Appellant generally invoked Section 512 of the MCARE Act, which, among other things, requires that an expert testifying as to a physician's standard of care must:

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

(3) In the event the defendant physician is certified by an appropriate board, be board certified by the same or a similar approved board, except as provided in subsection (e).

40 P.S. § 1303.512(c). Appellant opened his lead argument with the assertion that, as a radiation oncologist, Dr. Sanford was not qualified to testify against a urologist, thus implicating Section 512(c)(2). The argument proceeded as follows:

Plaintiff secured the opinions of Shelby P. Sanford, M.D. To support her claims of negligence against Dr. Golio. Dr. Sanford is a radiation oncologist! He has *no* specialized education, training or experience in the field of urology. In retrospect, Dr. Sanford is critical of Dr. Golio for failing to perform additional testing, by way of x-ray or CT to rule out metastasis. He is critical of Dr. Golio for not supplying the bone scan report to Dr. Onufrey[, a radiation oncologist to whom Appellant referred Mr. Gbur in connection with the brachytherapy procedure].

Dr. Sanford issued an affidavit to show that he is very familiar with bone scans and brachytherapy. He affirms that he routinely orders and reviews bone scans. The audacity of all of this is that he is not critical of radiation

oncologist, Dr. Onufrey, who was the primary physician concerning the brachytherapy. By his own admission, Dr. Onufrey never looked at the bone scan/MRE reports. He never asked for them. He never looked at the actual films. He never bothered to explore why he was missing Pages one (1) through (6) of Dr. Golio's fax.[1] He simply was lazy and he elected to allow other specialists, *i.e.* [a medical oncologist] and Golio to do his work for him. The coup de grate [sic] is when he cannot produce pages one (1) through six (6) of the fax, but rather, replaces the six pages with a self-serving note. Why did Dr. Onufrey fail to chart in May 2002 what he charted in March 2003, when he discussed these matters with his patient? Why is Dr. Sanford silent about all of this?

Dr. Golio is not the consultant. He is the referring physician. Dr. Onufrey is the expert. When did it become standard of care for the referring physician to tell the consultant how to do his job? Dr. Golio sends to the consultant, precisely what the consultant requests. How is Dr. Golio supposed to know what is important to the consultant, if the consultant did not ask for it. It will prove to be a grave injustice to Dr. Golio, if Dr. Sanford is permitted to criticize his care of the decedent in this case.

*Gbur v. Golio,* No. GD03–005415, Motion in Limine (September 9, 2005).

Appellee's responses included references to Dr. Sanford's affidavit, indicating, among other things, that:

He trained in brachytherapy procedures involving radioactive seed implantations into the prostate at The University of Alabama, Birmingham, as well as at The University of Washington, Seattle in 1995. He has personally performed approximately fifty brachytherapy procedures, each time working with the urologist, as is standard practice. The standard of care for brachytherapy is a national standard.

---

1. Appellant suggested in the pre-trial submissions and at trial that the bone scan and associated report were at least intended to be sent to Dr. Onufrey via telecopy, although the materials did not appear in medical records he produced.

As a part of the treatment protocol for prostate cancer patients, he regularly orders and reviews bone scan tests and, either directly or in conversation with the patients' other treating physicians, determine[s] how the results of the bone scan testing will impact the patient's treatment protocol. The standard for physicians reviewing bone scans and the impact that the results of the same have upon treatment of prostate cancer is also a national standard.

Appellee also invoked waiver provisions associated with the same-specialty requirement set forth in Section 512(d) and (e) of the MCARE Act, as follows:

(d) Care outside specialty.—A court may waive the same subspecialty requirement for an expert testifying on the standard of care for the diagnosis or treatment of a condition if the court determines that:

(1) the expert is trained in the diagnosis or treatment of the condition, as applicable; and

(2) the defendant physician provided care for that condition and such care was not within the physician's specialty or competence.

(e) Otherwise adequate training, experience and knowledge.—A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

40 P.S. § 1303.512(d), (e).

The motions were denied on a pre-trial basis.

At trial, Appellant's counsel orally renewed his motion *in limine*, again arguing that:

Dr. Sanford is a radiation oncologist. Dr. Golio is a urologist. Dr. Sanford has never spent one day practicing as urologist. While he might have some knowledge of certain areas of treatment like brachytherapy, which is involved in

this case, he works on it and analyzes the case from the prospective [sic] of a radiation oncologist and not a urologist.

So we feel that he is unable to offer opinions in that regard. He does not satisfy the elements of MCARE. That's essentially the gist of the first issue, Your Honor.

N.T., September 16, 2005, at 4–5. Appellant also renewed his effort to shift any responsibility to Dr. Onufrey for inappropriately failing to address the bone scan prior to participating in the brachytherapy procedure. *See id.* at 16–17. Appellee's responses included development of the position that the MCARE Act's same-subspecialty requirement is not as rigid as Appellant represented, but that it requires only practice in a subspecialty which has a substantially similar standard of care for the care at issue. *See id.* at 7. Further, Appellee again invoked Section 512's various waiver provisions. As to Dr. Onufrey, Appellant noted that his conduct was not at issue in the case, and that Appellant was free to seek contribution if appropriate. *See id.* at 17. Consistent with the prior rulings, the trial court denied the oral motion *in limine.*

On *voir dire* examination, Dr. Sanford explained that radiation oncology is the discipline of evaluating patients who may or do have cancer, deciding how they need to be treated, and administering radiation treatment. In this connection, he explained that radiation oncologists regularly read radiographic films and reports. Further, he indicated that he has special education and training in brachytherapy. Dr. Sanford also indicated that ten to twenty percent of his patients have prostate cancer. In response to a question concerning whether the standards for the staging and treatment of prostate cancer are national in character, Dr. Sanford replied, "I would say that is a national standard. I know of no regional standards." N.T., September 19, 2005, at 122. On cross-examination concerning his qualifications, Dr. Sanford conceded that he had no formal education, training, or expertise in the discipline of urology, other than by way of a two-month residency rotation. *See id.* at 124. The trial court accepted

Dr. Sanford as an expert, and Appellant indicated that he was preserving his prior objections.

Upon direct examination, Dr. Sanford proceeded to reiterate and expound upon the conclusions previously set forth in his report. In particular, Dr. Sanford described the bone scan film for Mr. Gbur as "flagrantly positive" for metastasis and indicated that the radiologist interpreting the scan had used the strongest terms in conveying the positive result. *See* N.T., September 19, 2005, at 189, 223. Dr. Sanford noted that Appellant nevertheless had noted in Mr. Gbur's medical records that the "bone scan [was] negative," which Dr. Sanford found absolutely to contradict the report. According to Dr. Sanford, "no urologist, radiation oncologist or anybody on just reviewing the family record would supersede the opinion of a board certified radiologist on that point." *Id.* at 209. On the medical records, Dr. Sanford found "no acknowledgement [on Appellant's part] of the metastasized disease, and no treatment plan to further diagnose, delineate or treat it." *Id.* at 214. Consistent with his report, Dr. Sanford opined that it was a breach of the applicable medical standard of care to conduct the brachytherapy procedure without alerting Mr. Gbur concerning his widely metastasized disease. *See* N.T., September 20, 2005, at 318. Appellee also presented the videotape deposition of Mr. Gbur, who by the time of trial had died, in which Mr. Gbur testified that Appellant did not discuss the bone scan or report with him and indicated that, had he known of the metastasized cancer, he would have consulted an oncologist as opposed to a series of dentists for his jaw pain.

Appellant countered with testimony from a board certified urologist and a radiation oncologist, both of whom indicated that Appellant met the applicable standard of care in his treatment of Mr. Gbur. *See* N.T., September 22, 2205, at 691; N.T., September 21, 2005, at 609, 613–614.[2] A particular focus of the experts was upon Appellant's receipt, several days after receiving the results of the bone scan, of an MRI scan and

---

2. Appellant also presented testimony from a medical oncologist, whose testimony was more limited for reasons which are not relevant to this appeal.

report which did not disclose any local spread of cancer in Mr. Gbur's pelvic region. The defense experts characterized the circumstances presented to Appellant as a "diagnostic dilemma" and opined that he reasonably erred on the side of recommending curative, as opposed to palliative, treatment. *See, e.g.,* N.T., September 22, 2005, at 685–686 (indicting that there was a "ten to maybe a fifty percent chance in this patient's case that these are not metastases" and "[y]ou would hate to miss [the] opportunity to cure him."). They testified that they believed that Appellant's treatment plan was made in consultation with a radiologist, was reasonable under the circumstances, and was within the appropriate standard of medical care, particularly as metastasis to the mandible is a relatively rare occurrence. *See, e.g., id.* at 672. Further, the defense contended that Mr. Gbur's conduct contributed to his own suffering, since in November 2001 he had taken it upon himself to leave a hospital emergency room against medical advice. *See* N.T., September 21, 2005, at 532–534.

The jury rendered a verdict awarding monetary damages in favor of Appellee,[3] and Appellant filed motion for post-trial relief challenging, *inter alia,* the admission of Dr. Sanford's testimony concerning the applicable, medical standard of care. The trial court denied relief, explaining in general terms, that the MCARE Act recognizes that overlap can occur between and among medical specialties. The trial court referenced Section 512(c)(1) of the MCARE Act, 40 P.S. § 1303.512(c)(1), which requires that a plaintiff's expert be substantially familiar with the applicable standard of care at issue as of the time of the alleged breach (but which does not address the separate, same-subspecialty requirement raised by Appellant). The court observed that, in his practice, Dr. Sanford examines patients like Mr. Gbur on a regular basis and is knowledgeable as to their diagnosis, treatment, and care. Additionally, the trial court indicated that, under the MCARE Act, it had discretion in assessing qualifications for expert medical opinions and noted that it had found that Dr. Sanford met those requirements as a result of his treatment of cancer patients.

---

**3.** The jury also found Mr. Gbur to have been negligent and apportioned ten-percent of the responsibility to him.

On appeal, the Superior Court affirmed in a published opinion. *See Gbur v. Golio*, 932 A.2d 203 (Pa.Super.2007). The court developed Dr. Sanford's qualifications in detail, concluding that the radiation oncologist was eminently qualified to testify concerning the standard of care applying to a urologist in the factual circumstances presented. With regard to the MCARE Act's requirements, the Superior Court initially indicated that Appellant relied primarily upon Section 512(d), the care-outside-subspecialty waiver provision attaching to the same-subspecialty requirement. Upon its review of Dr. Sanford's qualifications, the court highlighted that he "had significant contact with urologists and, more importantly, [he had] actually treated patients with prostate cancer." *Gbur*, 932 A.2d at 210. Further, the Superior Court explained that:

the thrust of Dr. Sanford's testimony did not relate to the substantive field of urology as such, but rather to Appellant's failure to consider and, basically, to ignore the results of the all-important bone scan report's findings, his failure to discuss these findings with the attending radiologist who performed these studies, his failure to communicate those bone scan results and findings to other treating physicians of [Mr. Gbur], and his failure to relate those results and findings to the patient himself and/or to the patient's family. Dr. Sanford, thus, concluded that such failures permitted the prostate cancer to further metastasize to the mandible, delayed the appropriate palliative treatment, subjected [Mr. Gbur] to futile Brachytherapy surgery, caused unnecessary and painful dental treatment and led to [Mr. Gbur's] painful and most unfortunate demise. Since much of his testimony had nothing whatsoever to do with the substantive field of urology, and since Dr. Sanford is eminently qualified to render the opinions that he did, the trial court below was correct in exercising its discretion and in allowing Dr. Sanford to testify as an expert witness.

*Id.* at 210 (footnote omitted).

For these reasons, the Superior Court concluded that "Dr. Sanford did in fact meet the standard required to testify to

care outside his own particular specialty under section [512](d) of the MCARE Act." *Id.* Finally, the court indicated that Section 512(c)(2)'s same-subspecialty requirement may be waived where the testifying physician has expertise in a subspecialty "which has a substantially similar standard of care for the specific care in issue." *Id.* at 211 (citing *Herbert v. Parkview Hosp.,* 854 A.2d 1285, 1292 (Pa.Super.2004)). The Superior Court also noted that, in the *Herbert* case, another panel had indicated that its "reading [of this section of the MCARE Act] comports with Pennsylvania courts' historical deference to trial courts' discretion in deciding whether to admit evidence at trial and is consistent with the plain language of the statute itself." *Id.* at 211 n. 5.

In allowing the appeal, we framed the question presented as follows:

> Whether the MCARE Act foreclosed a plaintiff in a medical malpractice action against a urologist from offering expert testimony from a radiation oncologist to develop the applicable standard of care for the treatment of a cancer patient, upon the urologist's review of a bone density study indicating "multiple foci of abnormal activity involving the right and left sides of the pelvis, the lower thoracic spine, right ribs, right mandible ... consistent with osseous metastatic disease."

*Gbur v. Golio,* 596 Pa. 619, 947 A.2d 1239 (2008) *(per curiam).* The appropriate interpretation of the MCARE Act poses legal questions, over which our review is plenary.

Presently, Appellant argues that, when the General Assembly enacted the MCARE Act, it overhauled the standards for qualifying expert witnesses in medical malpractice cases with the objective of curtailing frivolous lawsuits, which the Assembly regarded as contributing to skyrocketing insurance premiums and a flight of capable physicians from Pennsylvania to states with friendlier legal climates. To further this objective, Appellant asserts, the Legislature supplemented the former, liberal common law standard governing the qualification of expert witnesses with a substantially stricter regimen, including the same-subspecialty and board-certification require-

ments. According to Appellant and his *amici*, the Pennsylvania Medical Society and the Pennsylvania Defense Institute, the trial and intermediate appellate courts have failed to enforce these enhanced standards, but rather, in substance and effect, have continued to apply the common-law approach. Appellant and his *amici* strongly urge that we apply the MCARE requirements strictly, in furtherance of the salutary legislative aims.

For example, in the present case, Appellant criticizes the trial court's analysis as superficial and faults the court for failing to acknowledge, comment upon, or make findings of fact regarding the Section 512(c)(2) and (c)(3) requirements. Along the same lines, Appellant challenges the Superior Court for failing to meaningfully address these requirements and for proceeding directly to the waiver provision of Section 512(d). *See* Brief for Appellant at 19 ("In rejecting a straw man argument under subsection 512(d) that Dr. Golio had not pursued, the court failed to conduct the rigorous inquiry required by subsection 512(c)."). Appellant also stresses that, by the terms of the statute, 512(d)'s care-outside-subspecialty waiver provision operates only in relation to the same-subspecialty requirement, and not the board-certification requirement. Thus, Appellant complains that the Superior Court's reasoning wholly fails to address one of his arguments on appeal.

According to Appellant, the record in this case is substantially inadequate to support a qualification on Dr. Sanford's part to render an opinion concerning the standard of care applicable to a urologist. Appellant stresses that, during *voir dire*, Dr. Sanford never stated that he was familiar with the standard of care applying to a urologist treating a patient in Mr. Gbur's circumstances. Moreover, Appellant highlights that Dr. Sanford also never testified that a substantially similar standard of care pertained across the disciplines of radiation oncology and urology for the care of patients suffering from prostate cancer. As a result, Appellant argues that the trial court's and Superior Court's determinations are grounded only on pure speculation, including the unsupported

assumption that a universal standard of care applied in the circumstances. Appellant also urges that this Court's review of the record should center on the qualifications *voir dire* preceding the trial court's ruling admitting Dr. Sanford's testimony, as this was the only predicate upon which the trial court could have relied in making that decision. Appellant seeks a holding that a party claiming her expert satisfies the strictures of subsection 512(c)(2) must place specific evidence to this effect on the record, noting that other jurisdictions with similar statutes require a clear evidentiary showing.[4]

In addition, Appellant criticizes the Superior Court's conclusion that Appellee was entitled to a Section 512(d) waiver, where there was no evidence that the care given by Appellant was outside his specialty or competence, and where it was undisputed that brachytherapy is part of the treatment overseen by urologists. According to Appellant, the Superior Court's holding that Section 512(d) was satisfied without any discussion concerning care outside subspecialty will create more confusion, controversy, and dilution of the express legislative intent.

Appellant also argues that Appellee failed to demonstrate that board certification in radiation oncology is the same as, or similar to, board certification in urology, as he asserts is required by subsection 512(c)(3). Appellant stresses that neither the trial court nor the Superior Court even considered whether Dr. Sanford was able to satisfy this provision. Finally, Appellant also argues, at length, that Appellee was not entitled to a waiver of Section 512(c) requirements under Section 512(e).

4. *See, e.g., Cleveland v. United States,* 457 F.3d 397, 406 (5th Cir.2006) (applying Louisiana law in holding that an internist was not qualified to testify as to the standard of care pertaining to an emergency-room physician in diagnosing congestive heart failure, where the internist "never stated that the standard of care for diagnosing congestive heart failure in the emergency room setting is identical to its diagnosis in the field of internal medicine"); *Whittemore v. Classen,* 808 S.W.2d 447, 456–57 (Tenn.Ct.App.1991) (holding that a radiologist was not qualified to testify against a surgeon, in the absence of testimony concerning his knowledge of the standard of care for a surgeon).

In response, Appellee agrees that the trial court's opinion is vague and does not specify whether it found radiation oncology to have a substantially similar standard of care for the specific care at issue as urology, or if the trial court found an applicable waiver. Appellee, however, faults Appellant for failing to request a factual hearing on his motion *in limine* or to ground his complaints more specifically on Section 512's specific terms, as he does now. Appellee notes that Appellant merely contended before the trial court that a radiation oncologist could never testify against a urologist under the MCARE Act, a position which is facially erroneous in light of latitude under Section 512(c)(2) pertaining to subspecialties governed by substantially similar standards of care and Section 512(d) and (e)'s waiver provisions. According to Appellee, Dr. Sanford's qualifications to testify under Section 512 were further established at trial by his testimony, as well as that of Appellant and his own experts. Appellee contends that such testimony confirmed the similarity of radiation-oncologist- and urologist-directed metastasized-prostate-cancer care; the identity of those subspecialties' standards of care for the specific care at issue; and the similarity and relatedness of the two subspecialties.

Appellee emphasizes that Dr. Sanford offered no criticism of Appellant's performance of traditional, strictly urologic functions. According to Appellee, all of the care at issue is the type of care—entailing the diagnosis, staging, and treatment of metastatic cancer—provided in the same fashion by radiation oncologists, medical oncologists, and urologists. Appellee contends that the record unequivocally establishes that her expert radiation oncologist was substantially familiar with the applicable standard of care for the specific care at issue, reading bone scans, recommending treatment based on those results, and communicating those results to the patient and other providers. *See* Brief for Appellee at 27 (asserting that "[t]he record is undisputed that, whether a physician is a radiation oncologist or urologist engaged in metastasized prostate cancer care . . ., no physician should attempt to override the opinion of the interpreting radiologist without proof, a

metastasized prostate cancer patient should not be treated as one whose cancer is non-metastasized, antiluteinizing drugs should never be interrupted in a metastasized prostate care patient, and they should not undergo brachytherapy." (citations omitted)). Appellant observes that Appellant did not argue, and the record would not support the contention, that there is any specific way a urologist should have interpreted Mr. Gbur's bone scan or rendered the treatment recommendation in this case.

Appellee also presents an extensive argument concerning the waiver provision at Section 512(e). Further, she observes that this Court may affirm on any proper grounds appearing as of record. *See, e.g., E.J. McAleer & Co. v. Iceland Products, Inc.,* 475 Pa. 610, 613 n. 4, 381 A.2d 441, 443 n. 4 (1977).

At the outset, many of Appellant's points raised in this appeal are well taken. Certainly Appellant is correct that, although there is some overlap between the common-law and MCARE standards, the MCARE Act imposes specific, additional requirements that should not be overlooked or diluted by the courts without proper justification.[5] Indeed, in *Wexler,* we recognized that the Legislature in Section 512 adopted the expert competency standards proposed by the Pennsylvania Medical Society, *see Wexler,* 593 Pa. at 132 n. 12, 928 A.2d at 981 n. 12, which were obviously designed to impose stricter standards than prevailed under common law. *Accord id.* at 135, 928 A.2d at 983 (Castille, J., dissenting) ("With respect to expert testimony, the MCARE Act works a very deliberate revolution, in favor of medical malpractice defendants, adopting a heightened standard for admissibility for medical expert testimony.").[6] We also agree with Appellant and his *amici*

5. In *Wexler v. Hecht,* 593 Pa. 118, 928 A.2d 973 (2007), Mr. Chief Justice (then Justice) Castille alluded to a potential issue concerning the authority of the General Assembly to legislate in the arena. *See Wexler,* 593 Pa. at 140–41 n. 3, 928 A.2d at 986 n. 3 (Castille, J., dissenting). We offer no comment on this subject, since the matter is not before us at this time.

6. It should also be noted that the MCARE Act also makes manifest the Legislature's intention to "ensure a fair legal process and reasonable

that, where material factual controversies are presented, rulings under Section 512 should be made on a developed evidentiary record. In this regard, the trial court may, in its discretion, conduct a pretrial evidentiary hearing in the event the matter is raised before trial.[7] Furthermore, to assist in the appellate review, the trial court should make specific, supported findings regarding the particular requirements of Section 512(c) that are in dispute.

Appellant is also correct that the present record does not contain a trial-court finding that Dr. Sanford practices in a subspecialty having a standard of care substantially similar to urology for the specific care at issue. Additionally, upon our review, we find the factual record on the subject to be lacking, at least through the time of the trial court's ruling permitting the testimony. In this regard, admission of Dr. Sanford's standard-of-care testimony consistent with such provision is not fully justified on the face of the qualifications *voir dire*, since Dr. Sanford does not practice in the same subspecialty as Appellant, and he did not testify on *voir dire* that radiation oncology has a substantially similar standard of care to urology for the specific care at issue. *See* 40 P.S. § 1303.512(c)(2).[8]

compensation for persons injured due to medical negligence in this Commonwealth." 40 P.S. § 1303.102.

**7.** Deferring ruling until the qualifications *voir dire* may be cumbersome, where the defendant seeks to adduce countervailing evidence.

**8.** In his pretrial affidavit, Dr. Sanford referenced a "national standard," which, in context, appears to have been intended to represent a standard of care applicable across subspecialties. However, the affidavit was not admitted into evidence at trial, and in context, Dr. Sanford's trial testimony concerning a "national standard" appears to speak to geographic boundaries. *See* N.T., September 16, 2005, at 122 (reflecting Dr. Sanford's response to a question concerning whether the applicable standard is a national one: "I would say that is a national standard. I know of no regional standards."). As such, and since this is the only *voir dire* testimony which arguably could represent a harmonization of standards applicable across the radiation-oncology/urology disciplines, we credit Appellant's core position that insufficient evidence of a similarity of standards was adduced during the *voir dire*.

In the substantive portion of his testimony, Dr. Sanford did testify, as previously noted, that "no urologist, radiation oncologist or anybody on just reviewing the family record would supersede the opinion of a board certified radiologist on that point [of interpreting a bone scan]." N.T., September 19, 2005, at 209. We agree, however, with Appellant that

We also appreciate Appellant's and his *amici's* substantial critique concerning precision in judicial review. Appellant is correct that the trial court's opinion reflects a mistaken focus on Section 512(c)(1), which represents only a portion of the MCARE Act embodying the common-law standard for the admission of expert testimony; whereas the enhanced requirements invoked in Appellant's post-trial motions are set forth elsewhere in the statute. Moreover, Appellant correctly observes that the Superior Court's analysis finds no factual support on the face of the record of Dr. Sanford's *voir dire*,[9] nor does the court's reasoning address Appellant's argument on appeal concerning Section 512(c)(3)'s board-certification requirement. A Section 512(d) waiver (the primary subject of the Superior Court's reasoning) on its terms simply does not address this requirement. *See* 40 P.S. § 1303.512(d) (prescribing that "[a] court may waive the *same subspecialty requirement* for an expert testifying on the standard of care" on the noted conditions) (emphasis added). Similarly, while the Superior Court made passing reference to Section 512(c)(2)'s same-subspecialty requirement, it did not (and could not) reference any trial-court finding on the subject or point to evidence of record through Dr. Sanford's *voir dire* to support the conclusion that that requirement was met.

While we recognize that our courts must strive to maintain a high caliber of performance in the administration of justice, the litigants also bear some responsibility in assisting the courts in achieving the desired sharpness. Here, for example, Appellant's pretrial motions, and his oral motion *in limine* asserted at the outset of trial, stand in stark contrast to the focused arguments now presented in Appellant's brief before this Court. Significantly, in Appellant's objections asserted before and during trial, he did not mention that

such testimony is not directly relevant to the trial court's decision on expert qualifications, given that it was adduced after the court's ruling.

9. As Appellant explains, Section 512(d) concerns out-of-subspecialty care, and Dr. Sanford did not testify that the primary care in question—namely, the diagnosis, staging, and treatment of prostate cancer—was outside of Appellant's subspecialty.

Appellant is board certified or otherwise develop an argument invoking Section 512(c)(3).[10] It is unremarkable, then, that the trial court's responses did not focus upon Section 512(c)(3). Indeed, we find that, in failing to put the trial court on sufficient notice that he intended to invoke the board-certification requirement of Section 512(c)(3), Appellant failed to preserve such issue for appellate review. *See National Union Fire Ins. Co. of Pittsburgh v. Gateway Motels, Inc.*, 551 Pa. 407, 409, 710 A.2d 1127, 1128 (1998) ("It is axiomatic that in order to preserve a trial objection for review, trial counsel is required to make a timely, specific objection during trial." (citing *Takes v. Metro. Edison Co.*, 548 Pa. 92, 98, 695 A.2d 397, 400 (1997))).[11]

■ Similarly, with regard to the MCARE Act's same-subspecialty requirement, Appellant's invocations of Section 512 were framed in fairly categorical terms. *See, e.g.*, Motion in Limine ("Dr. Sanford is a radiation oncologist! He has *no*

10. Appellant's arguments could be read as touching on Section 512(c)(3) only in that he indicated in general terms that Dr. Sanford was not qualified under Section 512 and quoted Section 512's lengthy text (embodying many requirements) in its entirety.

11. *See also* Pa.R.C.P. No. 227.1(b)(1) (foreclosing the availability of post-trial relief where available grounds are not raised in pretrial proceedings or by an appropriate method at trial); Pa.R.E. 103(a)(1) (requiring statement of the specific ground for an objection to the · admission of evidence, unless the specific ground is apparent from the context).

In concurrence, Madame Justice Greenspan opines that Appellant preserved an objection based on the same-approved-board requirement, asserting that his substantive arguments "led directly and *only* to" such requirement, as compared to the multiple other provisions of the statute. Concurring Opinion, at 462 (emphasis in original). Although Justice Greenspan chastises our opinion as exalting form over substance, *see id.*, she fails to offer a single reference to the record of the pre-trial or trial proceedings in which Appellant actually substantively invoked, or even referred to, the same-approved-board requirement, other than in his broad quotation of the statute as a whole. Trial courts are not required to parse independently through the multiple provisions of a quoted statute to consider terms that are not treated in the development of a party's objection. Indeed, Justice Greenspan appears to recognize as much in her acknowledgment that Appellant did not raise challenges under several other of the MCARE statute's provisions quoted in Appellant's motion *in limine* but not pursued in his arguments.

specialized education, training or experience in the field of urology." (emphasis in original)). Nowhere in the development of his objections did Appellant acknowledge that Section 512(c)(2), on its terms, may be satisfied where the plaintiff's expert practices in a subspecialty having a substantially similar standard of care for the specific care at issue or address Dr. Sanford's opinions on such terms. Furthermore, at trial, Appellant also did not complain to the trial court that the evidentiary record was deficient under Section 512(c)(2), as he does now. Indeed, as developed above, each of Appellant's arguments on the standard-of-care matter devolved into tangents concerning perceived unfairness in the Gburs' decision to hale him into court, as opposed to other treating physicians. We find these complaints, as framed, insufficient to put the trial court and Appellee on fair notice that Appellant was challenging the sufficiency of the evidentiary record to support substantial similarity of the standards of care pertaining in the subspecialties of radiation oncology and urology and relating to the diagnosis and treatment of metastasis.[12]

In her concurrence, Justice Greenspan sets out to prove that Appellant lodged an objection to Dr. Sanford's testimony's concerning the applicable standard of care. *See* Concurring Opinion at 84–88, 963 A.2d at 460–62. We have acknowledged the assertion of an objection in this regard. However, we have also addressed Appellant's actual arguments in considerable detail, because they are qualitatively and materially different from those asserted in this appeal.

It appears to be the position of the concurrence that it was well known before trial that Appellant was challenging Appellee's ability to prove the disciplines of urology and radiation oncology maintain a substantially similar standard of care for

12. In this regard, this Court has explained that the primary purpose of the requirement of a timely and specific objection is to ensure that the trial court has the opportunity to correct alleged trial errors. *See Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 260, 322 A.2d 114, 117 (1974). Other courts have also stressed that a timely and specific objection also affords an opposing party the opportunity to address the objection and, where appropriate, to cure a defect. *See generally* 75 Am.Jur.2d Trial § 312 (2008) (collecting cases).

the care at issue; and that it was equally well understood that such challenge extended, during and after trial, to Appellee's actual proofs. *See* Concurring Opinion at 88, 963 A.2d at 462. Despite such purported knowledge on the part of Appellee's counsel and the trial court, however, neither addressed the objection on any such terms. For the part of Appellee's counsel, he never actually created a record on the subject at the *voir dire* stage,[13] and he did not ask to supplement the record when Appellant's objection was reasserted.[14] As for the trial court, despite its supposed understanding that Appellant was rendering a specific substantial-similarity challenge, it never made a finding on the subject.

In our view, the more reasonable conclusion is that neither Appellee's counsel nor the trial court actually understood Appellant's objection as encompassing the argument now being asserted on appeal, since the pre-trial and trial objections were never couched in such terms. In short, we believe that the root cause of the material disharmony between the present record and the primary claim asserted on appeal is that such claim was not adequately asserted in the trial court. Rather, Appellant's challenge was a more abstract one which, accordingly, was answered in a more abstract fashion by both Appellee and the trial court.[15]

13. The concurrence does not disagree with our conclusion that the record of the *voir dire* is materially insufficient in this regard, but rather, declines to address it. *See* Concurring Opinion at 92–93 n. 6, 963 A.2d at 465 n. 6.

14. The concurrence suggests it is clear that Appellee's counsel understood the character of the objection, since he paraphrased MCARE's requirements in his responsive comments. *See* Concurring Opinion at 86–88, 963 A.2d at 461–62. In the quoted passage, however, Appellee's counsel appears to have been doing what he had done all along, that is, answering Appellant's categorical objection by demonstrating that the MCARE Act, in relevant part, simply is not categorical.

15. Notably, Appellee has consistently read Appellant's pre-trial and trial objections exactly as we do. *See* Brief for Appellee at 2 ("Defendant solely contended that a radiation oncologist could never testify against a urologist under the Act"); Plaintiff's Brief in Opposition to Defendant's Motion for Post–Trial Relief at 35 ("Defendant's entire argument is that Dr. Golio is a urologist and Dr. Sanford is a radiation oncologist."). The trial court also viewed the objection on precisely the same terms. *See Gbur v. Golio*, No. GD03–5415, 2006 WL 5345498 (C.P. Allegheny June 22, 2006) ("Golio has excepted to this ruling [on the admissibility

In response to Justice Greenspan's criticism that we are inviting legal malpractice actions, we have no such intention. We mean only to enforce existing procedural rules by limiting the ability of parties to reconstitute their objections on appeal, as we believe that this is the most appropriate way to maintain fundamental fairness in civil litigation. Consistent with our rules, our approach facilitates specific and pertinent responses by the proponent of the evidence and salient findings by the trial court, and appropriately channels proceedings on appeal. Although the concurrence characterizes the subject differently, the MCARE Act's expert qualifications provisions present technical matters raising novel legal and factual questions involving a sophisticated, multi-dimensional field of higher learning. We do not believe it is too much to ask of trained legal professionals litigating medical malpractice actions at the trial level to treat the subject matter accordingly.

In summary, whereas we agree with the general proposition that appellate courts should not be overly stringent in their review of the specificity of pre-trial and trial objections, there are also untenable disadvantages in extending broad liberality.

Parenthetically, Appellee is correct that Appellant's own substantive position on the standard-of-care matter remained somewhat vague throughout trial. Although strongly contesting Dr. Sanford's competency to render an opinion in general terms, Appellant did little in the proceedings to frame a particularized standard of care different from that which was identified by Dr. Sanford. Certainly the defense experts differed with Dr. Sanford's ultimate conclusion and his opinion concerning the degree to which the bone scan and associated report confirmed the metastasis—contrary to Dr. Sanford's beliefs, the defense experts discerned a diagnostic dilemma arising out of the bone scan and MRI reports.[16] Nevertheless,

of Dr. Sanford's expert testimony] and asserts *only* another urologist is qualified to opine about Golio's conduct." (emphasis in original)).

16. According to Dr. Sanford, there was no diagnostic dilemma, as the purpose of the MRI and bone scan were different, since the MRI was directed toward detecting a spread of cancer in the pelvic region, whereas the bone scan served to detect distant metastasis. *See* N.T., September 19, 2005, at 184, 228, 344.

the defense urologist agreed with the two pillars of Dr. Sanford's statement of the governing standard of care pertaining to a urologist or other physician treating prostate cancer. In this regard, the defense urologist confirmed that the standard of care required Appellant to consult with a radiologist concerning the bone-scan results prior to discounting them.[17] According to the defense urologist, Appellant also should have consulted with Mr. Gbur concerning the results of the bone scan:

> In this case I would have said to Mr. Gbur that your bone scan looks like you have a possibility of cancer. Your MRI says no. There is a decent chance that you have metastatic disease, and you will die from your prostate cancer. But there is also a small possibility that these are not metastases, and you could be cured. . . . Maybe we should think about radiation therapy in your case.

> \* \* \*

> Q: Did you see any evidence—do you recall seeing any evidence in Dr. Golio's deposition or Mr. Gbur's deposition that those concepts were communicated to Mr. Gbur in this case?

> A: I hadn't seen that in the transcript.

> Q: It is the patient's choice to make; isn't it?

> A: Ultimately.

> Q: Based upon the information available to him as communicated to him by his treating physician?

> A: Correct.

N.T., September 22, 2005, at 705–06.

Notably, based on the results of the bone scan and MRI, the defense urologist testified that there was an approximately

17. *See, e.g.,* N.T., September 22, 2005, at 683 (reflecting the defense urologist's confirmation that he relies on the radiologist's opinion in staging patients); *id.* at 715 (reflecting the defense urologist's response to a question concerning uptake on the bone scan, "Well, I'm not a nuclear medicine doctor. The people who read those, that is their job."); *id.* at 716 ("Again, this is not my area of expertise."). *See generally id.* at 729 (reflecting the defense urologist's indication that a bone scan is the most commonly used screening test for metastasis).

fifty to ninety percent chance that metastasis had occurred. *See* N.T., September 22, 2005, at 685. However, Appellant's records reflect his notation "bone scan negative," and his own descriptions of his conversations with Mr. Gbur strongly suggest that he did not mention to the patient the possibility that the multiple, visible areas of uptake on the bone scan, including the jaw area, reflected metastasis. For example, the following interchange occurred in Appellant's deposition:

Q Did you give [Mr. Gbur] any explanation as to what you determined the increased uptake [on the bone scan] to represent?

A I mentioned that he had arthritis. And the bone scan can show uptake for many reasons.

Q Did you tell him what those reasons were?

A What do you mean? Every single reason?

Q Or the major ones.

A Major ones, arthritis, inflammation. That is the substance of it.

Deposition of Anthony Golio, M.D., at 49–50 (Jan. 5, 2004) (admitted into evidence, N.T., September 21, 2005, at 492). The following similar exchange occurred on cross-examination at trial:

Q. You didn't think that it was appropriate for you to advise [Mr. Gbur] of this allegedly equivocal bone scan saying consistent with osseous metastatic disease at all those sites?

A. I didn't think it was necessary.

N.T., September 23, 2005, at 914.

Dr. Sanford never testified that it would have been a breach of the applicable medical standard of care for Appellant to proceed as he did after full consultation with a radiologist and Mr. Gbur. Appellant's asserted failures to consult a radiologist and Mr. Gbur were the linchpins to Dr. Sanford's opinion and Appellee's liability case.[18] As such, there is substantial force

18. The evidence conflicted concerning whether Appellant consulted with a radiologist regarding the results of the bone scan and MRI testing. Appellant testified that he did. Appellee, however, adduced

to Appellee's position that the central dispute in the case did not pertain to the standard of care *per se*, but rather, concerned subsidiary facts.

In light of the above, we conclude that Appellant failed to adequately develop and preserve an objection to Dr. Sanford's testimony pursuant to Section 512(c)(3) of the MCARE Act, as well as his present challenge to an insufficient evidentiary foundation to support Dr. Sanford's qualification under Section 512(c)(2).

Finally, Justice Greenspan describes the statutory scheme as a simple one and contends it is plain that 512(e), 40 P.S. § 1303.512(e), applies, based on her assessment of Dr. Sanford's training, experience, and knowledge. *See* Concurring Opinion at 463–65. In this regard, however, the concurrence does not address the substantial counter-arguments raised by Appellant and his *amici*.

Appellant and his *amici* devote lengthy portions of their briefs to urging this Court not to interpret the MCARE Act's exceptions to the same-subspecialty and board-certification requirements to allow trial courts full discretionary authority to admit expert testimony against a medical professional either expressly, or effectively, on the basis of the common-law criteria standard for admissibility alone. Such discretion, they

evidence from the radiologist (Richard O. Bolden, M.D.) who prepared the bone scan report indicating that Appellant did not consult with him after the transmittal of the report. *See* Deposition of Richard O. Bolden, M.D. at 4 (August 3, 2004) (admitted into evidence N.T., September 21, 2005, at 493). Additionally, the radiologist testified that, if he would have altered his opinion concerning the presence of metastasis, he would have revised his report. *See id.* At trial, Appellee also stressed that Appellant had indicated in his deposition that he spoke with Dr. Bolden, *see* Golio Dep. at 43, but that, subsequent to Dr. Bolden's deposition, Appellant altered his position, testifying that he consulted with an unidentified radiologist in a hospital radiology department. *See* N.T., September 23, 2005, at 833–34. (Appellant's explanation for the revision was that his deposition response was produced by artful questioning on the part of Appellee's attorney, *see id.* at 920.).

The primary evidence that Appellant did not advise Mr. Gbur of the results of the bone scan derived from the videotape deposition of Mr. Gbur. *See* Deposition of Joseph Gbur, Jr., at 15 (June 5, 2003) (admitted into evidence, N.T., September 22, 2005, at 748–749).

argue, squarely conflicts with the Legislature's effort to implement meaningful medical malpractice reform by substantially raising the standards for admissibility, thus supplanting the liberal common-law standard. As concerns Section 512(e), Appellant and his *amici* stress that the exception expressly pertains to "related field[s] of medicine," 40 P.S. § 512(e), and that, to effectuate the clear legislative intent, such terms must be given meaning beyond some mere overlap among the respective subspecialties. *Accord Miville v. Abington Memorial Hosp.*, 415 F.Supp.2d 500, 500 n. 1 (E.D.Pa.2005). Further, Appellant and his *amici* argue that courts should not simply assume that two fields of medicine are related; rather, an evidentiary record supporting the proposition should be required to support a specific finding. In this regard, they note that Appellee never introduced any evidence to establish that the fields of radiation oncology and urology are "related fields of medicine," and the trial court never so found.

As framed by The Pennsylvania Medical Society,

The § 512(e) exception, particularly as applied to the 'same specialty' rule, requires particular caution; to implicate it, the expert necessarily practices in neither the same specialty nor in one that has a similar standard of care for the treatment at issue. To testify, the expert must explain how, despite failing these core requirements, s/he is nevertheless familiar with the applicable standard of care in the defendant's specialty. That is seemingly a very difficult task, and a court should not grant it routinely but only on a proper showing.

Enforcing these criteria is part of a trial court's gatekeeper function.

\* \* \*

What qualifies as a "related field of medicine under § 512(e) should be narrowly construed with the purpose of the "same specialty" requirement in mind. A relevant factor would be whether the specialties shared a residency track through which physicians received education, training, and experience in providing the care at issue.

* * *

It is not sufficient that the expert merely provides the care at issue from time to time in his/her own specialty. That is precisely what the Legislature sought to change when it enacted the "same specialty" and "board certification" requirements. Allowing that to suffice would virtually repeal the "same specialty" requirement. As previously discussed, physicians in different specialties may be confronted with similar medical conditions, but may have different standards of care due to varying degrees of expertise and differing approaches.

Brief for *Amicus* The Pennsylvania Medical Society at 17–18, 24. Further, Appellant and his *amici* perceive a disturbing trend in the case law of retreating from the MCARE Act's elevated qualification standards by improperly invoking a trial court's liberal common-law discretion, recharacterizing the medical issues, and failing to evaluate all of the MCARE Act's pertinent provisions based on a proper evidentiary record.

Again, in our view, there are weighty counter-arguments competing with the concurring position. Indeed, we agree with Appellees that the term "related fields of medicine" must mean more than fields of medicine which are "related" in the most generic sense of the word, since Section 512(e) serves as a component of reform legislation designed to meaningfully enhance the standards governing the admissibility of expert testimony in medical professional liability cases. It would not be reasonable, therefore, to conclude that the Legislature intended the Section 512(e) exception merely to operate along the lines of the previously existing common-law standard, thus depriving the enhanced standards of force. *See generally* 1 Pa.C.S. § 1922 (codifying the presumption that the Legislature did not intend an absurd or unreasonable result).[19] Rath-

19. Although Justice Greenspan finds a legislative intent to balance the MCARE Act's enhanced requirements for the admission of expert testimony with the common-law standard, the legislative history appears to suggest otherwise. The following remarks of a representative are illustrative:

The gentleman from Chester talked about expert witnesses. No more flimflam, higgledy-piggledy, harum-scarum expert witnesses; we are

er, as Appellant and his *amicus* contend, the statute should be read to require a close enough relation between the overall training, experience, and practices of the expert and that of the defendant-physician to assure the witness's expertise would necessarily extend to standards of care pertaining in the defendant-physician's field. Contrary to Justice Greenspan's perspective, we find the mere fact that two physicians may treat the same condition to be insufficient, in and of itself, to establish such a relation among their fields of medicine. While, in light of our conclusion concerning issue preservation we need not apply Section 512(e) in the present case, we would venture to say those practicing radiation oncology and urology might be surprised to learn of a judicial pronouncement— offered without reference to relevant supporting testimony from those practicing in the respective subspecialties beyond a discussion of a single area of treatment overlap—that their disciplines represent related fields of medicine for purposes of reform legislation.

The order of the Superior Court is affirmed.

Justice McCAFFERY did not participate in the consideration or decision of this case.

Justice EAKIN and Justice TODD join the opinion.

Justice GREENSPAN files a concurring opinion in which Chief Justice CASTILLE and Justice BAER join.

Justice GREENSPAN, concurring.

I write separately because, in my view,[1] Appellant properly preserved his objection to Dr. Sanford's qualifications under Sections 512(c)(2) ("the same subspecialty requirement") & (3)

going to take the Pennsylvania Medical Society's definition of what an expert witness is, and those are the men and women who will be in court on these kinds of medical malpractice cases.

House Legislative Journal, February 13, 2002, at 301 (remarks of Hon. H. William DeWeese). As previously developed, there should be no doubt that the General Assembly was addressing what members considered to be a serious crisis and intended to make meaningful and substantial changes in response.

1. Like the Opinion Announcing the Judgment of the Court, this Concurring Opinion has the support of three of six participating Justices.

("the same approved board requirement") of the MCARE Act. Consequently, I would reach the merits of this appeal. As to the merits, I would affirm on the basis that, at a minimum, Dr. Sanford was eligible for a waiver of those requirements under Section 512(e).

In the Opinion Announcing the Judgment of the Court ("OAJC"), Justice Saylor, joined by two Justices, concludes that Appellant failed to preserve his objections to Dr. Sanford's qualifications under the same subspecialty and same approved board requirements. He reaches this conclusion because, in his view, Appellant's written and oral motions in limine objecting to Dr. Sanford's testimony were not sufficiently specific. I respectfully disagree.

The relevant facts cited in the OAJC are as follows: In his pretrial motion in limine, Appellant begins his argument challenging Dr. Sanford's testimony by providing the entire text of Section 512, which lists a total of six requirements, including the same subspecialty and same approved board requirements, and two exceptions that govern one or both of these two requirements. Appellant then argues: "Dr. Sanford is a radiation oncologist! He has *no* specialized education, training, or experience in the field of urology." *Gbur v. Golio*, No. GD03–005415, Motion in Limine (September 9, 2005) (emphasis in original). At trial, Appellant renewed his motion orally, stating:

> Dr. Sanford is a radiation oncologist. Dr. Golio is a urologist. Dr. Sanford has never spent one day practicing as a urologist. While he might have some knowledge of certain areas of treatment like brachytherapy, which is involved in this case, he works on it and analyzes the case from the prospective [sic] of a radiation oncologist and not a urologist.
>
> So we feel that he is unable to offer opinions in that regard. He does not satisfy the elements of MCARE. That's essentially the gist of the first issue, Your Honor.

N.T., September 16, 2005, at 4–5.

A litigant's challenge to the admission of evidence is preserved for appeal if that litigant files a motion in limine or

makes a timely objection, either of which must state the specific grounds of the objection if the specific ground is not apparent from the context. Pa.R.Evid. 103(a). *See, e.g., Trach v. Fellin,* 817 A.2d 1102, 1107 n. 3 (Pa.Super.2003) (en banc). Appellant cited to Section 512 in both his written and oral motions in limine, then emphasized that Dr. Sanford (a radiation oncologist) and Appellant (an urologist) were not the same type of specialist. Section 512(c)(2) requires that a proffered expert practice in the same subspecialty or in a subspecialty with a substantially similar standard of care as the care at issue. Section 512(c)(3) requires that a proffered expert possess the same board certification or a certification by a similar approved board as the defendant physician. The trial court here was not "required to parse independently through the multiple provisions" of Section 512.[2] Majority Op. at 454 n. 11. That Appellant challenged Dr. Sanford's testimony under Section 512's requirements that an expert be the same or a similar type of specialist was certainly, at minimum, apparent from the context of both his written motion and oral objection in accordance with Rule 103(a).

Furthermore, Justice Saylor's focus on the "categorical" nature of Appellant's objection is misplaced. Section 512 places the burden on Appellee, the party proffering Dr. Sanford, to demonstrate that Dr. Sanford either meets Section 512's requirements or qualifies for a statutory waiver of certain requirements. To preserve an objection to Dr. Sanford's testimony, Appellant's written and oral motions needed only be sufficient to invoke Appellee's burden to establish Dr. Sanford's competency,[3] which they were.

**2.** The OAJC focuses on the fact that Appellant provided a "broad quotation of the statute [Section 512] as a whole." Majority Op. at 454 n. 11. It is important to note, however, that only two of the quoted provisions are not relevant to Appellant's pre-trial and trial objection to Dr. Sanford's testimony regarding Appellant's standard of care on the basis that Dr. Sanford was not a urologist. In my view, Appellant's surplusage was too minimal to distract Appellee and the trial court from the challenges he raised.

**3.** On the other hand, where the objecting party bears the burden of persuading the trial court that challenged testimony is inadmissible, the degree of specificity of a litigant's objection—which may include the

Although I believe Appellant's challenges to Dr. Sanford's testimony were sufficiently specific under the facts considered in the OAJC alone, additional facts in the record also support the conclusion that Appellant properly preserved the issue. In his pretrial motion in limine, Appellant argued that Appellee's expert "should be precluded from offering testimony regarding *standards of care*." *Gbur v. Golio*, No. GD03–005415, Motion in Limine (September 9, 2005) (emphasis added). At trial, Appellant followed up on this motion, arguing: "The first motion in limine is to preclude Dr. Sanford from offering any *standard of care* opinions against Dr. Golio." N.T., September 16, 2005, at 4–5 (emphasis added). In my view, Appellant's motions in limine were sufficient to preserve challenges under Section 512(c) of the MCARE Act, which is titled—and directly addresses testimony on a defendant physician's—"STANDARD OF CARE."[4]

Moreover, I believe that the record indicates that both Appellee and the trial court were fully aware of the nature of Appellant's challenge to Dr. Sanford's testimony. Appellant's oral objection at trial, which renewed his pretrial motion in limine, spurred a lengthy discussion among counsel for both parties and the trial court, during which Appellee's counsel addressed the trial judge as follows:

> The issue before you is[:] is Dr. Sanford qualified to testify? The specific statutes in MCARE, Statute 1303.512, C, where he has to be substantially familiar with the applicable standard of care if he's not in the same specialty; that he practices in the same subspecialty or in a subspecialty which has a substantially similar standard of care for the specific care at issue. . . . And then the third part is if [Dr. Golio's] approved by a board, [Dr. Sanford] got [*sic*] to be certified

quality of his advocacy—is much more important. *See, e.g., Commonwealth v. Berrios*, 495 Pa. 444, 434 A.2d 1173, 1177 (1981) (holding that the issue of whether testimony improperly referenced unrelated criminal activity was waived where defendant objected only to the relevance of such testimony).

4. Although the OAJC centers on Appellant's preservation of his objection prior to and during trial, I also note that Appellant's Motion for Post–Trial Relief remained consistent with his earlier challenges to Dr. Sanford's testimony as to the standard of care applicable to Appellant.

by the same or similar approved Board in regard to the specific care at issue.

N.T., September 16, 2005, at 18.  Counsel's remarks further illustrate that Appellant's objection was sufficiently specific to, and *did,* put both the trial court and the Appellee on notice that he challenged Dr. Sanford's qualifications under the same subspecialty and same approved board requirements.[5]

Justice Saylor blames Appellant for the trial court's failure to address substantively the same approved board requirement in its Opinion and Order.  In his Motion for Post–Trial Relief, however, Appellant specifically invokes that requirement, arguing that "under Section 1303.512(c)(3) of the [MCARE] Act, when an expert testifies with respect to the standard of care for a procedure performed by a board-certified physician, the testifying expert must be board certified by the same or a similar approved board."  Defendant's Motion for Post–Trial Relief at 6, ¶ 52.  Moreover, had the trial court not been fully aware of a challenge under Section 512(c)(3) before or during trial (as Justice Saylor suggests), given Appellant's reference to that provision in his post-trial motion, it almost certainly would have noted Appellant's previous failure to specify his objection.  Therefore, in contrast to Justice Saylor, I fail to see how the trial court's failure to address Appellant's same approved board challenge in its subsequent opinion is attributable to any error by Appellant.

Most respectfully, I fear that—whether Justice Saylor intends such a result or not—by appearing to elevate form this far above substance, he may be inviting both civil litigants and criminal defendants to bring a broad array of malpractice actions and ineffective assistance claims even in cases where, as here, counsel and the trial court were fully aware of the specific objections being raised.

Certainly, a litigant's citation of irrelevant statutory provisions may risk diverting the trial court's attention from the

5.  Appellee admitted as much in the Superior Court.  *See* Superior Court Brief for Appellee at 28 ("'[Appellant]'s pre-trial Motion *in Limine* challenged Dr. Sanford's ability to testify solely on the basis of his alleged failure to satisfy the standards of MCARE. . . .'").

issues he or she wishes to raise. Here, however, that risk did not materialize from Appellant's minimal surplusage. Appellant not only cited the governing statute in his motions, but also styled arguments—and supported those arguments with facts—that led directly and *only* to the same subspecialty and same approved board requirements. Significantly, these oral and written motions did in fact put Appellee and the trial court on notice of Appellant's specific challenges to Dr. Sanford's testimony. Under these circumstances, Appellant properly preserved this issue for appeal.

I now turn to the merits of this appeal. In the trial court, Appellant argued that the same subspecialty and same approved board requirements of the MCARE Act precluded Dr. Sanford, a radiation oncologist, from testifying to the standard of care applicable to Appellant, a urologist. The Superior Court described the qualifications of Dr. Sanford:

Dr. Shelby Sanford is an honors graduate from the University of Alabama School of Medicine. . . . He is licensed to practice medicine in Alabama, and he has been Board Certified in radiation oncology since 1986. Since entering private practice in 1986, he has specialized in . . . radiation oncology. . . . Radiation oncology consists of evaluating patients who have cancer and administering different types of radiation treatment to such cancer patients. Dr. Sanford has treated between seventeen thousand and twenty thousand new cancer patients in the last twenty to twenty-one years. In the administration of his treatment, he reviews CT scans, MRIs, PET scans, thyroid CT scans and ordinary x-rays. Dr. Sanford's residency included training in Brachytherapy, a procedure using radioactive seed implantation to treat patients with prostate cancer. . . . Between ten percent and twenty percent of his patients have prostate cancer. The treatment of prostate cancer involves the reading of films, interpreting films, and the staging and treatment of prostate cancer patients. Dr. Sanford is a member of numerous medical societies dealing with the medical specialty of radiation oncology, and he has previously been qualified as a medical expert to testify in this field.

Although Dr. Sanford is not a formally trained urologist, he frequently treats patients with an elevated PSA and follows their progress. Dr. Sanford also consults with patients referred to him by urologists for second opinions. He supervises the radiation treatment of forty to sixty patients daily, and ten to twenty percent of those cases involve prostate cancer patients who are under active treatment by Dr. Sanford. He also regularly works with dentists and oral surgeons in treating patients with cancer of the mandible.

*Gbur v. Golio,* 932 A.2d 203, 207 (Pa.Super.2007).

Section 512(c) provides:

(c) STANDARD OF CARE.—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

40 P.S. § 1303.512(c).

The same subspecialty and same approved board requirements quoted above are both subject to Section 512(e), which provides:

OTHERWISE ADEQUATE TRAINING, EXPERIENCE AND KNOWLEDGE.—A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony *as a result of active*

*involvement* in or full-time teaching of medicine in *the applicable subspecialty* or a *related* field of medicine within the previous five-year time period.

40 P.S. § 1303.512(e) (emphasis added).

A plain reading of terms contained in Section 512's standard of care provisions reveals a simple statutory scheme. A proffered expert's failure to satisfy either the same subspecialty or same approved board requirements creates a *presumption* that the expert is not competent to testify. However, it is within the sound discretion of the trial court whether or not to waive those requirements when an expert, testifying to a physician's standard of care, possesses sufficient training, experience, and knowledge consistent with the other terms of Section 512(e). In this regard, the legislature attempted to strike a balance between raising standards for medical expert competency and preserving our appellate courts' "historical deference to trial courts' discretion in deciding whether to admit evidence at trial." *Herbert v. Parkview Hosp.*, 854 A.2d 1285, 1294 (Pa.Super.2004).

Justice Saylor, who does not reach the merits, suggests that such a reading of the statute is "in derogation of the legislative design" of the MCARE Act. Slip Op. at 28. However, this Court "must not disregard the statutory language under the pretext of pursuing its spirit." *Commonwealth v. Dickson*, 591 Pa. 364, 918 A.2d 95, 100 (2007) (citing 1 Pa.C.S. § 1921(b)). Moreover, "the best evidence of legislative intent is the words used by the General Assembly." *In re Nomination Petition of Paulmier*, 594 Pa. 433, 937 A.2d 364, 372 (2007). This Court must, whenever possible, give effect to all provisions of a statute, 1 Pa.C.S. § 1921(a), and unless a phrase has a technical, peculiar, or otherwise defined meaning, that phrase must be construed according to its common and approved usage. 1 Pa.C.S. § 1903(a).

The General Assembly, in constructing Section 512(e), granted trial courts the discretion to waive the same subspecialty and same approved board requirement under certain circumstances. Those requirements, in which the legislature

strictly mandates that a proffered expert's subspecialty and board certification be either the "same," "similar," or "substantially similar," can be waived if the trial court determines the expert has "sufficient training, experience, and knowledge" from "active involvement" in "the applicable subspecialty" or a "related field of medicine." Section 512(e), which uses non-technical language that is less stringent than the same subspecialty and same approved board requirements, must be given effect distinct from those requirements. Therefore, in my view, the General Assembly indeed raised the standards for expert witnesses testifying to a physician's standard of care when it created a presumption that an expert cannot testify unless he or she both practices in the same subspecialty, or in a subspecialty with a substantially similar standard of care, and is also certified by the same or similar approved board as a defendant physician. Additionally, this Court should not ignore that the legislature also expressly granted discretion to trial courts to consider broader qualifications than those required in Section 512(c)(2) & (3).

Consequently, because Dr. Sanford's testimony demonstrates that he was eminently qualified to testify to the standard of care applicable to Appellant as a result of his active involvement in the diagnosis and treatment of prostate cancer, I would hold that he was therefore eligible for a waiver of the same subspecialty and same approved board requirements under Section 512(e).[6] As between ten and twenty percent of Dr. Sanford's radiation oncology patients have

6.  I share Justice Saylor's view that trial court rulings under Section 512 should be made on a developed record and that the trial court should make specific findings regarding the particular requirements in dispute prior to admitting the expert's testimony. In this case, the issue of whether the record of voir dire was sufficient to permit Dr. Sanford's testimony at the time of his admission need not be reached, however, because Dr. Sanford's testimony more than revealed his fitness as an expert. Therefore, the trial court's possible failure to make supported findings on Dr. Sanford's qualifications prior to accepting him as an expert would merely be harmless error. See McAdoo Borough v. PLRB, 506 Pa. 422, 485 A.2d 761, 764 n. 5 (1984) (holding that this Court can affirm on any grounds supported by the record); E.J. McAleer & Co. v. Iceland Products, Inc., 475 Pa. 610, 381 A.2d 441, 443 n. 4 (1977) (same).

urological cancer, it is axiomatic that Dr. Sanford's expert testimony in this case came from his active involvement in this aspect of urology, i.e., the applicable subspecialty. Alternatively, to the extent that the record demonstrates that both radiation oncologists and urologists diagnose and treat prostate cancer, these two fields of medicine are certainly "related" in the common and approved sense of the word, and therefore Dr. Sanford also comes within that aspect of the statutory provision. Consequently, there is no need to reach the issue of whether Dr. Sanford would be competent under the same subspecialty and same approved board requirements.

For the reasons above, I depart from the reasoning upon which the Opinion Announcing the Judgment of the Court is premised, and would affirm on other grounds.

Chief Justice CASTILLE and Justice BAER join this opinion.