Carol RENNA, Appellee

v.

Mark SCHADT, M.D., Appellant.

Superior Court of Pennsylvania.

Argued Oct. 30, 2012.
Filed Feb. 25, 2013.
Reargument Denied May 1, 2013.

John R. Hill, Bethlehem, for appellant.

Edward P. Shaughnessy, Easton, for appellee.

BEFORE: STEVENS, P.J., BOWES, and PLATT,* JJ.

OPINION BY BOWES, J.:

Mark Schadt, M.D. appeals from October 26, 2011 judgment entered on the jury verdict in favor of Carol Renna following denial of post-trial motions in this medical malpractice action. He alleges that the trial court erred under the Medical Care Availability and Reduction of Error Act ("MCARE"), 40 P.S. § 1303.512, in permitting a pathologist and oncologist to render

* Retired Senior Judge assigned to the Superior Court.

expert testimony regarding the standard of care applicable to a surgeon, and in failing to grant a new trial or remittitur for what he views as an excessive verdict. After careful review, we affirm.

Carol Renna, a forty-six-year-old special education teacher, commenced this civil action against Dr. Schadt, a surgeon, alleging that on May 17, 2004, he deviated from the standard of care in performing a fine-needle aspiration biopsy instead of a computed tomography ("CT") guided core biopsy, on two lesions in her right breast. She maintained that the CT-guided core biopsy was a more advanced diagnostic technique, and that had Dr. Schadt employed it, she would not have suffered an eleven-month delay in the diagnosis of her breast cancer. Ms. Renna subsequently underwent a bilateral mastectomy on May 6, 2005, followed by chemotherapy and radiation of the right chest wall, treatment that she maintained was more extensive than would have been necessary had she been diagnosed earlier.

On August 20, 2010, Dr. Schadt moved for summary judgment on the ground that Ms. Renna's experts, John J. Shane, M.D. and Robert B. Sklaroff, M.D., did not possess the necessary qualifications to provide expert testimony regarding the standard of care applicable to a board-certified surgeon under MCARE because neither was a board-certified surgeon. Furthermore, their reports did not contain the requisite opinion, to a reasonable degree of medical certainty, that Dr. Schadt deviated from the applicable standard of care. On October 21, 2010, the Honorable Paula Roscioli denied the motion, concluding that both experts were qualified under MCARE § 512(e) because their fields of medical practice were related to the specific care at issue.

Trial commenced on April 26, 2011 before the Honorable Lawrence J. Brenner

and a jury. Ms. Renna described how she noticed two lumps that "felt like gravel" in September 2003. N.T. Trial, 4/26/11, at 53. She told her gynecologist about them, and he referred her for a mammogram and ultrasound, which revealed two cysts. *Id.* at 54. No follow-up was recommended. Ms. Renna mentioned the lumps to her primary care physician, and he suggested that she follow up with Dr. Schadt. Ms. Renna saw Dr. Schadt in May 2004. He performed an exam and recommended a needle biopsy. Ms. Renna inquired whether the lumps could instead be removed, and Dr. Schadt responded that, "if we did that, then you'll have breasts that look like Swiss cheese." *Id.* at 62. He performed the needle aspiration biopsy and several weeks later, Ms. Renna received a message from the office that the results were negative and everything was fine. She was not told by Dr. Schadt that the specimen submitted was not optimal. *Id.* at 137.

Ms. Renna testified that she returned to her primary care physician, Dr. Scharle, because she felt a new lump and the two existing lumps were larger. She underwent another mammogram on February 1, 2005. Again, due to very dense breast material, nothing suspicious was seen or noted, but Dr. Scharle was able to locate the lumps very easily. His office arranged for Ms. Renna to be seen again by Dr. Schadt on March 29, 2005. Dr. Schadt recommended and performed a needle biopsy, the results of which were found to be inconclusive. *Id.* at 68. A month later, on April 22, 2005, Dr. Schadt performed an excisional biopsy under general anesthesia at St. Luke's Hospital. The following Monday, he advised Ms. Renna that the results revealed cancer. *Id.* at 73. He recommended a mastectomy of the right breast and reconstruction at the same time. *Id.* After Dr. Schadt consulted with

an oncologist and additional testing was performed, he opted instead for a bilateral mastectomy and no reconstruction until later. Surgery was performed on May 6, 2005. Ms. Renna thereafter underwent eight rounds of chemotherapy and then radiation on the right side five days per week for sixty-five treatments. She could not return to teaching until late August 2006. As of trial, there had been no recurrence of cancer. She continued to take oral medications to reduce the risk of recurrence but had not undergone reconstruction. Reconstructive surgery was complicated by the fact that she did not have enough skin as a result of the chest wall radiation she had been required to undergo.

Following an extensive *voir dire*, the trial court found Ms. Renna's expert pathologist Dr. Shane to be qualified to opine as to the standard of care as it relates to fine needle aspiration and collection methods of biopsies, recognizing that the litigation did not deal "strictly with a surgical process." *Id.* at 57. Dr. Shane described the differences between fine needle aspiration and ultrasound-guided biopsy techniques generally and used radiographic evidence depicting the procedures for the jury's edification. He then explained Ms. Renna's pathology report generated on the specimen obtained by Dr. Schadt during the fine needle aspiration procedure. At the outset, he noted that the pathologist identified few epithelial cells present, indicating that the specimen was scanty. *Id.* at 61–62. He attributed the lack of epithelial cells to dense breast tissue, and explained that when one puts the needle in and draws back, the fibroconnective tissue prevents epithelial cells from being carried into the syringe. If a pathologist is present, he can evaluate the adequacy of the specimen. In the case of scanty epithelial cells, as many as three or four additional passes may be necessary to obtain a suffi-

cient sample. In this case, the pathologist reported "scanty epithelial cells" and characterized the specimen as "less than optimal due to limited epithelial cellular material." *Id.* at 64. That meant, according to Dr. Shane, that there were insufficient epithelial cells "to provide an accurate interpretation." *Id.* The pathologist reported that "although no malignancy is seen, the findings are not indicative of any specific pathologic energy," which meant that he was unable to examine those cells and make any diagnosis. *Id.* at 65. In his opinion, the result of the fine needle aspiration was a limited diagnosis based on a limited specimen. *Id.* at 66.

In response to questions regarding what other biopsy techniques can be used to obtain a larger specimen, Dr. Shane advised that repeated passes using the needle aspiration method with a pathologist on site evaluating the specimen would achieve that result. He offered, as another alternative, core biopsy, where a piece of tissue is removed and one examines cells invading normal tissues, as providing "the complete picture." *Id.* at 67. Ultrasound—guided fine needle aspiration assists the physician in getting the needle to the right spot to avoid false negatives. Dr. Shane testified that the failure to locate the needle properly in Ms. Renna's case resulted in the negative result, despite the existence of malignant cells. He opined further that a clinician should do fine needle aspiration biopsy under ultrasound or CT guidance, or preferably, CT-guided core biopsy, a technique available to clinicians for more than twenty years. *Id.* at 72.

Ms. Renna underwent a second fine needle aspiration on March 29, 2005. The pathology report was viewed by Dr. Shane as suspicious, and it prompted the excisional biopsy performed one month later. That biopsy revealed an invasive ductal carcinoma that was four to five times larg-

er than the original mass described, and staged as IIIA. A stage IIIA tumor is up to five centimeters in size with regional lymph node involvement. In Dr. Shane's opinion, during the eleven-month delay in diagnosis, the tumor grew significantly, gained greater access to lymphatic vessels, spread to the chest wall, and increased the potential to spread to other sites. *Id.* at 81. It would most likely have been a stage II or even a stage I tumor if diagnosed in 2004. He opined that the negative outcome in 2004 could have been the result of the point of the needle being in the wrong location because there was no image guidance employed. *Id.* Blind fine needle aspiration procedures have a false negativity rate as high as fifty percent. With guidance, the false negativity rate is reduced by twenty to thirty percent, but false negatives are one of the major disadvantages of the technique. He concluded that had CT-guided core biopsy been performed on May 17, 2004, they would "without question" have found the tumor. *Id.* at 84.

Robert B. Sklaroff, M.D., board-certified in internal medicine, clinical hematology/oncology, testified that core biopsies have a far lower percentage of false negatives than fine needle aspiration. *Id.* at 140. He opined that a core biopsy with some type of guidance was the standard of care upon receipt of an insufficient specimen from the fine needle aspiration. In addition, he testified that the negligent delay in diagnosis resulted in a lower five and ten-year survival rates and likely contributed to Ms. Renna's decision to undergo bilateral mastectomy.

The defense called three medical experts in addition to Dr. Schadt: Arthur McTighe, M.D., a pathologist board certified in anatomic and clinical pathology, microbiology, dermatopathology, and cytopathology; Thomas Frazier, M.D., a surgeon; and Rene Rubin, M.D., a board

certified internist, hematologist and oncologist. Dr. Frazier testified that, in his opinion, Dr. Schadt did "essentially what most surgeons would do" and "that it was an appropriate approach." *Id.* at 87. On cross-examination, in response to the question of whether he "believe[d] that the fine needle aspiration that was performed on May 17, 2004, actually collected material from the lumps which were in Carol Renna's right breast," Dr. Frazier conceded that he could not answer that question. He also acknowledged that the nodules measured in March 2005 were five times larger than in May 2004.

The defense also called Rene Rubin, M.D., a board certified internist, hematologist and oncologist. She opined that Dr. Schadt's performance of a fine needle aspiration on the basis of the information known to him in May 2004 was quite appropriate and "very consistent with the standard of care." *Id.* at 120. She opined that Ms. Renna's decision to undergo bilateral mastectomy was "absolutely the correct thing for her to do." *Id.* at 123. However, she suggested that radiation might have been avoided if less than three lymph nodes were involved. *Id.* at 135–136.

Finally, Dr. Schadt testified that the fine needle aspiration was an appropriate modality for exploring whether the cyst-like lump was cancer and that the technique was preferable to core biopsy where cyst was suspected. He maintained that his management of Ms. Renna's care in 2004 complied with the standard of care and attributed the failure to diagnose cancer as a result of the biopsy to a sampling error, *i.e.,* "[i]t could be the area was missed[,]" or it could have been a cytopathology error. *Id.* at 209. He was not sure. *Id.*

The jury returned a verdict in favor of Ms. Renna in the amount of $400,000, consisting of $150,000 for past non-economic

loss and $250,000 in future non-economic loss. On May 9, 2011, Dr. Schadt filed a motion for post-trial relief seeking judgment notwithstanding the verdict ("judgment n.o.v.") or, in the alternative, a new trial or a remittitur. The trial court denied the motion, assessed delay damages stipulated to be $43,418.09, and molded the verdict to $443,418.09. Dr. Schadt filed a timely appeal; no Pa.R.A.P. 1925(b) statement was ordered. Dr. Schadt presents three issues for our review:

A. Is Dr. Schadt entitled to appellate relief, in the nature of a judgment n.o.v. or, in the alternative, a new trial due to the lower court's error and abuse of discretion in allowing Plaintiff's witnesses, John Shane, M.D. (a pathologist), and Robert Sklaroff, M.D. (an internist/oncologist/hematologist), to offer expert testimony with regard to the standard of care applicable to Dr. Schadt, a board certified surgeon, since Plaintiff's expert evidence contravened both the terms and spirit of 40 P.S. § 1303.512 as well as Pennsylvania's common law?

B. Is Dr. Schadt entitled to the entry of a judgment n.o.v. due to Plaintiff's failure to meet her burden of proving a breach of the surgical standard of care as well as the requisite element of causation or, in the alternative, is Dr. Schadt entitled to a new trial based on the weight of the evidence?

C. Is Dr. Schadt entitled to a new trial or, at a minimum, should this Court remand the litigation to the lower court for the entry of a remittitur, due to the unsupported and excessive verdict and award?

Appellant's brief at 7.

■ Dr. Schadt's first issue, which involves interpretation of the MCARE statute, presents a question of law. *Wexler v. Hecht,* 593 Pa. 118, 928 A.2d 973, 977 (2007). Thus, our standard of review is *de novo* and our scope of review is plenary. *Anderson v. McAfoos, M.D.,* —— Pa. ——, 57 A.3d 1141 (2012); *Gbur v. Golio,* 600 Pa. 57, 963 A.2d 443 (2009); *Hyrcza v. West Penn Allegheny Health Sys., Inc.,* 978 A.2d 961, 972 (Pa.Super.2009).

■ Dr. Schadt asserts first that the trial court erred when it permitted Drs. Shane and Sklaroff, a pathologist and an oncologist/hematologist/internist, both board certified, to render expert testimony regarding the standard of care of a board certified surgeon. The law is well settled that decisions regarding admission of expert testimony, like other evidentiary decisions, are within the sound discretion of the trial court. *Weiner v. Fisher,* 871 A.2d 1283, 1285 (Pa.Super.2005). We may reverse only if we find an abuse of discretion or error of law. *Smith v. Paoli Mem'l Hosp.,* 885 A.2d 1012, 1016 (Pa.Super.2005).

Ms. Renna argued that Drs. Shane and Sklaroff were qualified under Subsection 512(e) of the MCARE Act, and the trial court agreed. Section 512, "Expert qualifications," provides:

(a) GENERAL RULE.—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

(b) MEDICAL TESTIMONY.—An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature

and extent of the injury, must meet the following qualifications:

(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

(c) STANDARD OF CARE.—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

(d) CARE OUTSIDE SPECIALTY.—A court may waive the same subspecialty requirement for an expert testifying on the standard of care for the diagnosis or treatment of a condition if the court determines that:

(1) the expert is trained in the diagnosis or treatment of the condition, as applicable; and

(2) the defendant physician provided care for that condition and such care was not within the physician's specialty or competence.

**(e) OTHERWISE ADEQUATE TRAINING, EXPERIENCE AND KNOWLEDGE.—A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.**

40 P.S. § 1303.512 (emphasis added).

There is no dispute that Drs. Shane and Sklaroff were competent generally to render expert medical opinion testimony in a medical professional liability action. They each possessed an unrestricted physician's license, the education and training, knowledge and experience and were actively engaged in clinical practice. However, in order to render expert opinion regarding the standard of care of a physician, the expert must meet the additional requirements set forth in subsection (c) or fall within the exceptions delineated in subsection (d) or (e).

While Ms. Renna's physician experts testified that they were "substantially familiar with the applicable standard of care for the care at issue," they did not practice in the same subspecialty as Dr. Schadt, nor were they board certified in surgery. Thus, they were not qualified to render expert standard of care testimony by virtue of subsection (c). Nor does the exception provided in subsection (d) render them competent to offer standard of care testimony because while they were trained

in the diagnosis or treatment of breast abnormalities, Dr. Schadt was providing care within his surgery specialty.

Subsection (e) permits a trial court to waive the same specialty and board certification requirements for a standard of care expert if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of his full-time involvement in a **related field of medicine**. It is this language, as well as our Supreme Court's decision in *Vicari v. Spiegel,* 605 Pa. 381, 989 A.2d 1277 (2010) interpreting this language, that the trial court relied upon in ruling that Ms. Renna's experts were qualified to testify. For the reasons that follow, we find no abuse of discretion.

In *Vicari,* the Court construed the subsection 512(e) exception as a waiver of the same board and same specialty requirements where the physician had sufficient training, experience, and knowledge in a related field of medicine. Expressly adopting Justice Saylor's Opinion Announcing the Judgment of the Court in *Gbur, supra,* the *Vicari* Court held that

> it "must mean more than fields of medicine which are 'related' in the most generic sense of the word, since Section 512(e) serves as a component of reform legislation designed to meaningfully enhance the standards governing the admissibility of expert testimony in medical professional liability cases." *Gbur, supra* at 459 (Opinion Announcing the Judgment of the Court). Justice Saylor continued his interpretation as follows: "[T]he statute should be read to require a close enough relation between the overall training, experience, and practices of the expert and that of the defendant-physician to assure the witness's expertise would necessarily extend to

standards of care pertaining in the defendant-physician's field." *Id.*

> *Id.* at 1283–84. The Court went on to further explicitly hold that the "relatedness" of one field of medicine to another for purposes of subsection 512(e) cannot be established in a broad and general sense that will henceforth be applicable to all situations and all claims. **Rather, the "relatedness" of one field of medicine to another, under subsection 512(e), can only be assessed with regard to the specific care at issue.**

*Id.* at 1284. (emphasis supplied). Recognizing that fields of medicine may be related with respect to specific issues of care, and wholly unrelated with respect to others, the Court acknowledged that a relatedness determination would likely require "a supporting evidentiary record and questioning of the proffered expert during *voir dire.*" *Id.*

In *Vicari,* the defendant otolaryngologist surgically removed the decedent's tongue tumor. At trial, counsel for the defendant moved for a compulsory nonsuit, arguing that plaintiff's expert oncologist was not competent to testify against him or his radiation oncologist co-defendant because he was not certified in the same field as either of the defendants. The trial court agreed and granted a motion for nonsuit. This Court reversed and remanded for a new trial. Our Supreme Court granted allowance of appeal and affirmed. Justice McCaffery reasoned that the specific issue of care did not involve the performance of the surgery, but "whether Mrs. Vicari should have been given the option of chemotherapy and a referral to a medical oncologist." *Id.* Recognizing the multi-disciplinary approach to cancer therapy, the practice of convening "a 'tumor board,' consisting of physicians from a variety of specialties and subspecialties, including medicine, surgery,

diagnostic radiology, radiation oncology, and pathology[,]" the Court held that oncology was a related field to otolaryngology and radiation oncology for purposes of subsection 512(e) in that case. *Id.* The Court went on to conclude that internist/oncologist Dr. Blum had the requisite training, experience and knowledge to testify as to the specific standard of care at issue.

In the case before us, the issue of whether Ms. Renna's experts were competent to testify as to the standard of care applicable to Dr. Schadt first arose at summary judgment. Judge Paula Roscioli applied *Vicari,* finding it factually similar, and reasoned that, since the alleged malpractice did not involve criticism of Dr. Schadt's surgical technique in performing the fine needle aspiration but in choosing a diagnostic method known for a high incidence of false negatives rather than other methods, pathology and oncology were related fields with regard to the specific care at issue. In denying post-trial relief, Judge Brenner adopted much of Judge Roscioli's rationale and agreed that the proffered experts were familiar with the selection of diagnostic tools.

The record supports the trial court's conclusion. It was only after an extensive *voir dire* of pathologist John J. Shane, M.D., that the trial court permitted him to testify as a standard of care expert. While he does not perform biopsies, Dr. Shane was often present when surgeons would perform such procedures and he routinely examined the specimens obtained. He testified that he was familiar with fine needle aspiration, core biopsy, excisional biopsy, guided fine needle or core biopsies, and CT scan and magnetic resonance imaging ("MRI")-guided biopsies. N.T. Trial, 4/27/11, at 13. During his residency he reviewed cases for the Fox Chase Cancer Center and completed a fellowship re-

searching breast cancer in the post-menopausal years. *Id.* Additionally, he acquired vast experience with breast cancer at both St. Agnes and Lehigh Valley Hospitals. In the five years prior, he was active in the field of pathology and performed cytology and histology examinations and autopsies. *Id.* at 32.

In response to the trial court's question as to how pathology related to surgery, Dr. Shane testified, "[p]athology provides the diagnosis from the specimen that the surgeon provides." *Id.* He represented that he was "very familiar with the advantages and shortcomings of the various techniques of obtaining material for us as pathologists in which to make a diagnosis." *Id.* at 37. He expressed that he was knowledgeable and experienced in the adequacy of specimens of fine needle aspirations, the standard of care for using guided fine needle aspirations and core biopsies, and the staging and grading of cancers. *Id.* at 38.

The trial court ruled that Dr. Shane was not a surgical expert under MCARE as he was not in that specialty nor otherwise qualified to testify as an expert on the standard of care of a surgeon. *Id.* at 46. However, the court had no problem permitting him to testify as an expert pathologist. Shortly thereafter, the court expanded that ruling to permit Dr. Shane to opine as to the standard of care as it relates to fine needle aspiration and collection methods of biopsies, recognizing that the litigation did not deal "with a surgical process." *Id.* at 57.

Robert B. Sklaroff, M.D., board certified in oncology and internal medicine and also practicing in the field of hematology, certified that he was familiar with the standard of care of breast aspiration biopsy. N.T. Trial, 4/27/11, at 111. He described oncology as the "management of cancer in whatever modality is most desirable for

the patient[,]" and involving a collaboration with surgeons, radiation therapists, diagnostic people and other disciplines. *Id.* at 113–114. He recounted that there were times when he was present with a surgeon as biopsies were performed, observed as material was aspirated for pathological examination, and was involved in the decision to take a patient to surgery. *Id.* at 133. He did not profess to be an expert in the manner in which a surgeon performs a surgical procedure, but, regarding biopsies, he testified that he had the necessary expertise in the types of procedures selected. At the conclusion of extensive *voir dire* on his qualifications, the trial court found him "qualified in the area of internal medicine, clinical hematology/oncology as the standard of care as it would be linked to fine needle aspiration biopsy." *Id.* at 136.

The defense experts' testimony further supports the trial court's conclusion that pathology and oncology were related fields regarding the medical care at issue, biopsy techniques. Defense expert pathologist Arthur McTighe, M.D. confirmed that cytopathology deals with the adequacy of fine needle aspirations and agreed that cancer diagnosis and treatment is a multidisciplinary field in which he works in conjunction with surgeons, radiologists, medical oncologists and others. N.T. Trial, 4/28/11, at 8, 15. He testified that he believed his experience and training in cytopathology qualified him to opine about the standards of care for breast biopsy collection, *id.* at 15, and that with regard to biopsy techniques, the cytopathologist and the surgeon have overlapping expertise. *Id.* at 17. The court found him qualified as an expert for purposes of rendering expert testimony of the standard of care related to fine needle aspirations, core biopsies, and excisional biopsy, and he rendered such an opinion. *Id.* at 20.

Dr. Rene Rubin, a board certified hematologist/oncologist, professed familiarity with fine needle aspiration used to diagnose breast cancer. *Id.* at 114. While she did not personally perform the procedure, she worked closely with breast surgeons after the diagnosis was made. *Id.* at 115. She was permitted to opine that Dr. Schadt's use of fine needle aspiration "was very consistent with the standard of care." *Id.* at 121.

Thus, there was considerable evidentiary support for the trial court's conclusion that a board certified pathologist and oncologist practiced in specialties related to a surgeon for purposes of rendering expert testimony as to the specific standard of care at issue, *i.e.* opting to perform a fine needle aspiration in lieu of other available biopsy methods. Based on the record before us, we see no abuse of discretion in permitting Drs. Shane and Sklaroff to render standard of care expert testimony regarding the propriety of conducting a fine needle aspiration biopsy.

Dr. Schadt's second issue focuses not on the standard of care but upon the adequacy of expert causation testimony. In a medical negligence case, as in negligence cases generally, the plaintiff has the burden of proving that the defendant's conduct was negligent, *i.e.*, fell below the standard of care, and that the negligence was the factual cause of injury to the plaintiff. It has long been held that a *prima facie* case of professional negligence can be established by expert opinion testimony to the effect that defendant physician failed to exercise reasonable care in performing an undertaking to render services to a patient which the defendant should recognize as necessary for the other's protection, that this failure increased the risk of physical harm to the patient, and that such harm did in fact result. *Gradel v. Inouye*, 491 Pa. 534, 421 A.2d

674, 677 (1980) (quoting *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280, 1283 (1978)).[1] Dr. Schadt contends that judgment n.o.v. should have been granted because Ms. Renna failed to prove that his alleged negligence was a substantial factor in bringing about her injury.[2] It is Dr. Schadt's position that Ms. Renna would have suffered the same harm regardless of his alleged negligence; thus, his negligence was not the factual cause of the harm.

When examining the propriety of a trial court's decision to deny judgment n.o.v., we must determine whether there is sufficient competent evidence to sustain the verdict. We will review all of the evidence in the light most favorable to the verdict-winner and will give that party the benefit of every reasonable inference arising from that evidence while rejecting all unfavorable testimony and inferences. Judgment n.o.v. may be entered where: (1) the moving party is entitled to judgment as a matter of law and/or (2) the evidence is such that no two reasonable minds could disagree that the verdict should have been rendered for the moving party. Our scope of review is plenary concerning any questions of law.

*Carrozza v. Greenbaum*, 866 A.2d 369, 379 (Pa.Super.2004) (citations omitted).

This issue was hotly contested at trial. While Dr. Schadt contended that the treatment that Ms. Renna received was no different from what would have been recommended eleven months earlier and that her prognosis was the same, Ms. Renna's experts took a different view. Dr. Sklaroff opined that the prognosis for five-year survival dropped as a result of the delay in diagnosis and that the difference would persist beyond the five-year mark. N.T. Trial, 4/27/11, at 146. He continued that Ms. Renna made the choice to undergo bilateral mastectomy "in reaction to the awareness of the lesion had been around for at least a year and it had grown." *Id.* at 146. Dr. Shane noted that the size of the tumor had increased five times its original size in eleven months, growth he termed significant, and had spread to the lymph nodes and through the chest wall when diagnosed. He concluded that there was advancement of staging. *Id.* at 81. When Ms. Renna was originally seen in April 2004, the tumor was a stage II or perhaps a stage I, instead of a stage III. Even defense expert Dr. Rubin agreed that had the cancer been diagnosed in May 2004, Ms. Renna might have avoided chest wall radiation, a treatment that left her disfigured, and that made breast reconstruction complicated. N.T. Trial, 4/28/11, at 196. Dr. McTighe disagreed, opining that the tumor in the lymph nodes would not have been substantially smaller the eleven months before. *Id.* at 43. It was a slow-growing tumor and the lymph nodes were involved much earlier. In his opinion, Ms. Renna's treatment and prognosis would not have differed had the cancer been diagnosed earlier. *Id.* at 45. The jury, in the face of conflicting expert testimony, specifically concluded that Dr. Schadt's negligence was a factual cause of Ms. Renna's harm. *See* Verdict Slip, 4/29/11. As this verdict was supported by

---

1. The jury was instructed:
   "When the plaintiff presents expert testimony that the failure to act or delay on the part of the defendant physician has increased the risk of harm to the plaintiff, this testimony, if found credible, provides a sufficient basis from which you may find that the negligence was a factual cause of the injuries sustained."
   N.T. Trial, 4/29/11, at 52 (quoting Pa. S.S.J.I. (Civ) 14.20).

2. In lieu of "substantial factor," the term "factual cause" is now used.

the evidence, Dr. Schadt is not entitled to judgment n.o.v.

■ Dr. Schadt also maintains that he is entitled to a new trial since the verdict was against the weight of the evidence. The general rule in this Commonwealth is that a weight-of-the-evidence claim is primarily addressed to the discretion of the judge who actually presided at trial. *Armbruster v. Horowitz,* 572 Pa. 1, 813 A.2d 698, 702 (2002). Since credibility determinations are within the jury's realm, the authority of the trial judge to upset a verdict premised upon a weight claim is narrowly circumscribed. A trial judge cannot grant a new trial "because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion." *Thompson v. Philadelphia,* 507 Pa. 592, 493 A.2d 669, 672 (1985). Instead, a new trial should be granted only in truly extraordinary circumstances, i.e., "when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Id.*

The trial court concluded that it was ultimately for the jury to decide whether Dr. Schadt deviated from the standard of care and, if so, whether it was a factual cause of Ms. Renna's injury. While Dr. Schadt averred there was no evidence that earlier detection would have affected Ms. Renna's treatment or prognosis, the court disagreed. Defense expert Dr. Rubin agreed that earlier detection may have obviated the need for chest wall radiation. Dr. Sklaroff opined that the delay decreased Ms. Renna's survival rate and likely impacted her choice to undergo bilateral mastectomy. This, according to the trial court, was "more than enough to submit the matter to the jury on the issue of damages." Trial Court Opinion, 10/26/11,

at 13. Furthermore, the trial found nothing about the verdict that shocked its sense of justice or required a new trial. Mindful of our limited scope of review of a weight of the evidence claim, our obligation to respect the fact finder's credibility determinations and the weight it accords the evidence, we find no basis to challenge the trial court's denial of a new trial.

■ Finally, Dr. Schadt contends that the jury verdict was excessive as the result of the aforementioned errors and that a new trial or a remittitur was warranted on that basis. We previously concluded that there was no error that required a new trial. In *Tulewicz v. Southeastern Pennsylvania Transportation Authority,* 529 Pa. 584, 606 A.2d 425 (1991) (abrogated on other grounds by *Department of Public Welfare v. Schultz,* 579 Pa. 164, 855 A.2d 753 (2004)), our Supreme Court articulated the standard for setting aside a verdict as excessive:

The Court is not warranted in setting aside, reducing, or modifying verdicts for personal injuries unless unfairness, mistake, partiality, prejudice, or corruption is shown, or the damages appear to be grossly exorbitant. The verdict must be clearly and immoderately excessive to justify the granting of a new trial. The amount must not only be greater than that which the court would have awarded, but so excessive as to offend the conscience and judgment of the Court.

*Id.* at 426 (quoting *Stark v. Lehigh Foundries,* 388 Pa. 1, 130 A.2d 123, 135 (1957)). In *Mirabel v. Morales,* 57 A.3d 144, 150–51 (Pa.Super.2012), this Court held that counsel's references in closing argument to race appealed to the passions and prejudices of the jury, and were so egregious that no curative instruction could alleviate the taint, necessitating a new trial. *See Mittleman v. Bartikowsky,* 283 Pa. 485,

129 A. 566, 567 (1925) (holding that counsel calling the opposing party "the newer, slicker members of his race" was "so manifestly improper, and so glaringly out of place in an orderly trial of the issue created in this case, that we cannot say the verdict represents the decision of an impartial jury"). Dr. Schadt does not direct our attention to any impropriety that contributed to partiality or prejudice herein. Furthermore, the $400,000 verdict did not so shock the trial court's sense of justice as to suggest the verdict was based on improper considerations that would warrant a new trial.

■ In the alternative, Dr. Schadt argues that a remittitur is indicated. Dr. Schadt relies upon Pa.R.C.P. 1042.72[3] and *Vogelsberger v. Magee Womens Hospital,* 903 A.2d 540, 542 (Pa.Super.2006), for the proposition that the award of non-economic damages was excessive and unreasonable. His basis for a remittitur is largely a rehash of his arguments that he was not negligent in failing to timely diagnose Ms. Renna's cancer and that all of her damages were the result of the cancer, not of any perceived delay in diagnosis. He also argues, however, that if one were to consider Ms. Renna's age, her health and physical condition prior to diagnosis, the severity of her injuries, their effect on her ability to perform her normal daily activities, the duration of medical treatment and the pain and mental anguish, and the fact that she is now cancer-free more than five years after treatment, the verdict does not present reasonable compensation for the

injury. He calls the verdict "a clear expression of the jurors' sympathy for the situation experienced by Ms. Renna and/or prejudice against Dr. Schadt" due to trial court error that he fails to identify. Appellant's brief at 68. Ms. Renna counters that the additional pain and suffering caused by the chest wall radiation alone and its negative impact upon the likelihood of successful breast reconstruction justified the verdict.

■ Our standard of review from the denial of a remittitur is "circumspect" and "judicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant." *Rettger v. UPMC Shadyside,* 991 A.2d 915, 932 (Pa.Super.2010) (quoting *Potochnick v. Perry,* 861 A.2d 277, 285 (Pa.Super.2004)). "The question is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption." *Id.* Furthermore, "[t]he decision to grant or deny remittitur is within the sole discretion of the trial court, and proper appellate review dictates this Court reverse such an Order only if the trial court abused its discretion or committed an error of law in evaluating a party's request for remittitur." *Id.*

■ The trial court cited this standard and the considerations outlined in Pa. R.C.P. 1042.72(b) in its opinion. Cognizant of the fact that the amount of pain and suffering damages is primarily a jury

**3.** Pa.R.C.P. 1042.72(b) was rescinded on October 17, 2012, effective immediately. That former rule applied only to medical professional liability actions and provided:

(b) A damage award is excessive if it deviates substantially from what could be reasonable compensation. In deciding whether the award deviates substantially from what could be considered reasonable compensation, the court shall consider (1) the evidence supporting the plaintiff's claim; (2) factors that should have been taken into account in making the award; and (3) whether the damage award, when assessed against the evidentiary record, strongly suggests that the trier of fact was influenced by passion or prejudice.

question, *Krysmalski by Krysmalski v. Tarasovich,* 424 Pa.Super. 121, 622 A.2d 298, 312 (1993), the trial court found the evidence sufficient to support the jury's award of past and future noneconomic damages.[4] We find no abuse of discretion and no basis to disturb the jury's verdict.

For all of the foregoing reasons, we affirm the judgment entered in favor of Ms. Renna and against Dr. Schadt in the amount of $443,418.09.

Judgment affirmed.

---

4. Noneconomic loss is composed of (1) pain and suffering, (2) embarrassment and humiliation, (3) loss of ability to enjoy the pleasures of life, and (4) disfigurement. *See* Pa.S.S.J.I. (Civ.) 14.150.