J-A25012-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| R. BRIAN SHOBER, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF ROSALEE MARIE SHOBER, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| ST. JOSEPH MEDICAL CENTER; ST. JOSEPH REGIONAL HEALTH NETWORK; CAROL A. GREENBERG, EXECUTRIX OF THE ESTATE OF ROBERT GREENBERG, M.D.; MOHAMED F. SOUMAKIEH, M.D.; BORNEMANN HEALTH CORPORATION A/K/A BORNEMANN SURGERY ASSOCIATES, A/K/A BORNEMANN ANESTHESIA | |
| Appellees | No. 1887 MDA 2018 |

Appeal from the Judgments Entered October 26, 2018
In the Court of Common Pleas of Berks County
Civil Division at No: 10-11010

BEFORE:  STABILE, McLAUGHLIN, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.:　　　　　**FILED: APRIL 27, 2020**

Appellant, R. Brian Shober, individually and as executor of the estate of

Rosalee Marie Shober (Decedent), appeals from the judgments entered on

October 26, 2018 in the Court of Common Pleas of Berks County following a

jury verdict in favor of Appellee, Robert N. Greenberg, M.D. (Dr. Greenberg),

and directed verdicts entered in favor of Appellees, St. Joseph Medical Center

(the Hospital), St. Joseph Regional Health Network, Mohamed F. Soumakieh,

M.D. (Dr. Soumakieh), and Bornemann Health Corporation a/k/a Bornemann

Anesthesia (Bornemann). Appellant asserts trial court error for precluding a general surgeon from offering expert testimony against Dr. Soumakieh, an anesthesiologist; for refusing to deliver a "captain of the ship" jury instruction; and for precluding an anesthesia expert from testimony regarding the negligence of a "code team." Following review, we affirm in part, reverse in part, and remand.

The trial court summarized the underlying facts as follows:

On June 28, 2008, [Decedent] presented at the emergency room of [the Hospital], complaining of increasing abdominal pain over a period of several weeks. A CT of her abdomen revealed an intra-abdominal mass with retroperitoneal lymph nodes. Decedent was subsequently diagnosed with non-Hodgkin's lymphoma. Her oncologist recommended that Decedent begin chemotherapy the following week. [Dr. Greenberg, a general surgeon,] was to implant an intravenous catheter under Decedent's skin into a central vein in the chest for the delivery of chemotherapy. Dr. Greenberg explained the potential risks and complications of the procedure, including pneumothorax, laceration of the vessel, and cardiac tamponade to Decedent.

Dr. Greenberg performed the medical procedure on July 3, 2008. In his first approach, Dr. Greenberg encountered difficulty advancing the guidewire in the right subclavian vein, and Decedent experienced an episode of ventricular ectopy. Dr. Greenberg withdrew the wire. After the problem resolved, Dr. Greenberg resumed the operation and placed the wire without further problems via the right jugular vein. He finished the operation and left the operating room.

While removing the surgical drapes, a nurse noticed that Decedent's eyes were not dilating properly. She called [Dr. Soumakieh], the anesthesiologist, who returned to the operating room. Dr. Soumakieh evaluated Decedent. Dr. Greenberg was called back to the operating room. A cardiothoracic surgeon performed a transesophageal echocardiogram and identified a pericardial tamponade, a compression of the heart caused by fluid collecting in the surrounding sac. The surgeon performed a

pericardial window, draining fluid around the heart. Decedent was transferred to the intensive care unit. Decedent never regained consciousness and died on July 9, 2008. The final cause of death was certified as respiratory failure due to anoxic brain injury.

[Appellant] filed medical malpractice claims naming [the] Hospital, Dr. Greenberg, Dr. Soumakieh, and Bornemann Health Corporation as defendants. [Appellant] contended that Dr. Greenberg pierced Decedent's heart with the wire used to place a central venous catheter, causing a cardiac tamponade and eventually causing cardiac arrest. After [] Dr. Greenberg's death, his wife, Carol A. Greenberg, as the Executrix of his estate, was substituted as defendant. [Appellant] alleged that Dr. Soumakieh, the anesthesiologist, failed to timely diagnose the cardiac tamponade.

This case proceeded to a jury trial on June 11, 2018. After [Appellant] rested, all [Appellees] requested directed verdicts. [The] court granted the corporate [Appellees'] motions for directed verdicts on the agency claims and the direct negligence claims and Dr. Soumakieh's motion for a directed verdict. [The] court denied [] Dr. Greenberg's motion for a directed verdict. On June 15, 2018, the jury found that Dr. Greenberg was not negligent.

Trial Court Opinion, 2/4/19, at 2-3.

Appellant filed post-trial motions seeking a new trial. Following entry of judgments in favor of Appellees, Appellant filed this timely appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.[1]

Appellant presents six issues for our consideration.[2]

---

[1] We remind Appellant's counsel that a copy of the Rule 1925(b) statement is to be appended to an appellant's brief. Pa.R.A.P. 2111(a)(11) and (d).

[2] As phrased in his brief, each issue is preceded by a statement offering context to the question presented. We include only the question in our recitation of the issues.

- 3 -

1. [D]id the trial judge abuse its discretion in precluding Dr. Hornyak from offering expert testimony against [Dr. Soumakieh] for his separate and independent negligence in failing to timely diagnose and treat [Decedent's] intra-operative cardiac tamponade?

2. [D]id the trial judge abuse its discretion when disallowing [Appellant's] surgery expert from testifying to [Dr. Soumakieh's] *intra-operative failures* to timely diagnose and treat [Decedent's] cardiac tamponade by claiming that it would be duplicative, cumulative, repetitive testimony to that of [Appellant's] anesthesiologist expert, Dr. Weingarten, who did *not* opine on any intra-operative failures of either [Dr. Greenberg] or [Dr. Soumakieh]?

3. [D]id the trial judge commit reversible error in not giving [Appellant's] requested PaSSJI #1460 "Captain of the Ship" charge?

4. [D]id the trial judge abuse his discretion and/or commit error law in charging the jury with PaSSJI #1460 "Captain of the Ship" charge in response to the jury's questions [whether Dr. Greenberg was personally responsible "for negligence of his team members"]?

5. [D]id the trial court commit reversible error or otherwise abuse its discretion in disallowing Dr. Weingarten's testimony as to [a 15-minute delay in initiating "basic life support" or failure to have a "code cart" readily available in or near the operating room]?

6. [D]id the trial court commit reversible error in disallowing Dr. Weingarten's proposed testimony as to negligence and causation as addressed in his pre-trial expert reports?

Appellant's Brief at 6-9 (emphasis in original; footnote and some capitalization omitted).

In his first two issues, Appellant asserts that the trial court erred by refusing to allow Dr. Hornyak, a board-certified general surgeon, to testify regarding the standard of care of Dr. Soumakieh, a board-certified

- 4 -

anesthesiologist. Dr. Hornyak was subjected to *voir dire* regarding his qualifications as a surgeon and offered testimony critical of Dr. Greenberg, also a board-certified general surgeon. However, he was prevented from offering testimony against Dr. Soumakieh by virtue of a pre-trial order granting Dr. Soumakieh's motion *in limine* to preclude that testimony.

"The law is well settled that decisions regarding admission of expert testimony, like other evidentiary decisions, are within the sound discretion of the trial court. We may reverse only if we find an abuse of discretion." ***Renna v. Schadt***, 64 A.3d 658, 664 (Pa. Super. 2013) (citations omitted).

Appellant contends that Dr. Hornyak was qualified to offer expert medical testimony against Dr. Soumakieh under the MCARE Act.[3] Subsection 512 of the MCARE Act provides:

> (a) GENERAL RULE.—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.
>
> (b) MEDICAL TESTIMONY.—An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:
>
> > (1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.
> >
> > (2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

---

[3] Medical Care Availability and Reduction of Error Act, 40 P.S. § 1303.

Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

(c) STANDARD OF CARE.—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

(d) CARE OUTSIDE SPECIALTY.—A court may waive the same subspecialty requirement for an expert testifying on the standard of care for the diagnosis or treatment of a condition if the court determines that:

(1) the expert is trained in the diagnosis or treatment of the condition, as applicable; and

(2) the defendant physician provided care for that condition and such care was not within the physician's specialty or competence.

**(e) OTHERWISE ADEQUATE TRAINING, EXPERIENCE AND KNOWLEDGE.—A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in** or full-time teaching of **medicine in the applicable**

**subspecialty or a related field of medicine within the previous five-year time period.**

40 P.S. § 1301.512 (emphasis added).

At trial, Appellant's counsel conducted *voir dire* of Dr. Hornyak, and Dr. Greenberg's counsel conducted cross-examination on Dr. Hornyak's qualifications. The trial court accepted Dr. Hornyak as an expert qualified to testify as to the standard of care owed to Decedent by her surgeon, Dr. Greenberg. However, as noted above, Appellant's counsel was precluded from conducting *voir dire* of Dr. Hornyak to ascertain whether Dr. Hornyak possessed adequate training, experience, or knowledge to provide expert testimony regarding the standard of care owed by an anesthesiologist under Subsection 512(e). Again, Subsection 512(e) permits a trial court to waive the same specialty and board certification requirements for a standard of care expert "if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of his full-time involvement in a **related field of medicine**." **Renna**, 64 A.3d at 666 (emphasis supplied). As this Court noted in **Renna**, the trial court properly concluded the proffered experts were qualified to testify based on the statutory language as well as our Supreme Court's decision in **Vicari v. Spiegel**, 989 A.2d 1277 (Pa. 2010), which interpreted that statutory language.

As the **Renna** Court explained:

- 7 -

In **Vicari,** the Court construed the subsection 512(e) exception as a waiver of the same board and same specialty requirements where the physician had sufficient training, experience, and knowledge in a related field of medicine. Expressly adopting Justice Saylor's Opinion Announcing the Judgment of the Court in [**Gbur v. Golio**, 963 A.2d 443 (Pa. 2009)], the **Vicari** Court held that

> it "must mean more than fields of medicine which are 'related' in the most generic sense of the word, since Section 512(e) serves as a component of reform legislation designed to meaningfully enhance the standards governing the admissibility of expert testimony in medical professional liability cases." **Gbur, supra** at 459 (Opinion Announcing the Judgment of the Court). Justice Saylor continued his interpretation as follows: "[T]he statute should be read to require a close enough relation between the overall training, experience, and practices of the expert and that of the defendant-physician to assure the witness's expertise would necessarily extend to standards of care pertaining in the defendant-physician's field." **Id.**

**Id.** at 1283–84. The Court went on to

> further explicitly hold that the "relatedness" of one field of medicine to another for purposes of subsection 512(e) cannot be established in a broad and general sense that will henceforth be applicable to all situations and all claims. **Rather, the "relatedness" of one field of medicine to another, under subsection 512(e), can only be assessed with regard to the specific care at issue.**

**Id.** at 1284 (emphasis supplied).

**Renna**, 64 A.3d at 666. The Court explained:

Recognizing that fields of medicine may be related with respect to specific issues of care, and wholly unrelated with respect to others, the Court acknowledged that **a relatedness determination would likely require "a supporting evidentiary record and questioning of the proffered expert during voir dire." Id.**

*Id.* (quoting *Vicari*, 989 A.2d at 1284) (emphasis added).[4]

At argument on Dr. Soumakieh's motion *in limine*, Appellant's counsel explained:

> Dr. Hornyak is a surgeon. He performed in the operating room all the time, too, and as [Dr.] Soumakieh pointed out, when you're in the operating setting, you work as a team. . . . [Dr. Hornyak] knows what the standard of care of the anesthesiologist is because they share the same standard of care when it comes to managing complications that occur during that operation.
>
> For the record, I would like to present my request, I would phrase as this, [Appellant has] provided the record of expert Stephen Hornyak, M.D., his surgical specialty shares a substantially similar standard of care with anesthetists in the co[-]treatment of surgical patients suffering complications in surgery which require the co[-]treatment of the surgeon and the anesthesiologist working in tandem to successfully address the surgical complications. He possesses sufficient training and experience and knowledge in anesthesiology with regard to inter role operation, how to address it on that specific standard of care.

Notes of Testimony, Hearing, Dr. Soumakieh's Motion *in Limine*, 5/24/18, at 3-4.

Appellant's counsel explained that his designated expert anesthesiologist, Dr. Weingarten, would not be providing duplicative testimony regarding intra-operative events. Rather, Dr. Weingarten's

---

[4] Appellant cites a number of cases in which this Court has permitted an expert board certified in one specialty to testify against a defendant who is board certified in a different specialty or subspecialty. Appellant's Brief at 29-32. In *Vicari*, the Supreme Court noted that this Court "has addressed the qualifications required of a medical expert to testify as to standard of care, pursuant on Section 512, on several occasions." *Vicari*, 989 A.2d at 1282 n. 8. We observe that Appellant's case summaries are essentially lifted verbatim from that footnote.

testimony would be limited to issues regarding documentation errors and the availability of a code cart in the operating room once the code was called. *Id.* at 5-7. Nevertheless, the trial granted the motion *in limine*, thereby "precluding [the] unqualified opinions of Dr. Hornyak. Dr. Hornyak is a general surgeon, not a board certified anesthesiologist, so he's not qualified is the argument. [Appellant] has their own expert, Dr. Weingarten." *Id.* at 10.

In its Rule 1925(a) opinion, the court explained that "the only relationship between the [specialties of anesthesiologist and surgery] was that an anesthesiologist is needed for a surgeon to operate." Trial Court Opinion, 2/4/19, at 11. However, the court reached that conclusion without (1) assessing how anesthesiology and surgery might be related in terms of the specific issues of care encountered in addressing the complications that arose during and after Decedent's surgery, or (2) a supporting record established through questioning of Dr. Hornyak during *voir dire*, in accordance with the above-quoted excerpt from *Vicari*, 989 A.2d at 1284, and endorsed by this Court in *Renna*, 64 A3d at 666. Without the opportunity to qualify Dr. Hornyak and, as a consequence, without the ability to present any expert testimony against Dr. Soumakieh with regard to events occurring *before* recognizing that Decedent had coded, Appellant was prejudiced in the presentation of his case, as evidenced by the fact the trial court granted Dr. Soumakieh's motion for a directed verdict. Therefore, we conclude that the

trial court abused its discretion by granting the motion *in limine* and the directed verdict in favor of Dr. Soumakieh must be reversed. **See Fethorolf v. Torosian**, 759 A.2d 391, 393 (Pa. Super. 2000) (we may reverse grant of a directed verdict if the trial court abused its discretion or committed error of law controlling the outcome of the case). Further, in light of the admitted existence of an employer/employee relationship between Bornemann and Dr. Soumakieh,[5] the directed verdict against Bornemann on agency claims must also be reversed.

A new trial is required on Appellant's claims against Dr. Soumakieh at which time Appellant will be afforded the opportunity to conduct *voir dire*, with cross-examination as appropriate, at the conclusion of which the trial court shall determine whether Dr. Hornyak is qualified to offer expert testimony against Dr. Soumakieh under Subsection 512(e) of the MCARE Act.

Appellant's third and fourth issues challenge the trial court's refusal to deliver a "captain of the ship" jury instruction with regard to Dr. Greenberg. "Our standard of review regarding jury instructions is limited to determining whether the trial court committed a clear abuse of discretion or error of law which controlled the outcome of the case." **James v. Albert Einstein Medical Center**, 170 A.3d 1156, 1163 (Pa. Super. 2017). "In reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the

---

[5] **See** Soumakieh Answer to Amended Complaint at ¶¶ 12 and 58; Bornemann Answer to Amended Complaint at ¶ 12

function of this Court to determine whether the record supports the trial court's decision." **Commonwealth v. Thomas**, 904 A.2d 964, 970 (Pa. Super. 2006) (citation and alterations omitted). "The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal." **Id.** (citation omitted).

Again, Appellant complains the trial court erred in refusing to deliver a requested "captain of the ship" charge. As our Supreme Court explained in **Thomas v. Hutchinson**, 275 A.2d 23 (Pa. 1971):

> Briefly summarized, the "captain of the ship" doctrine imposes liability on the surgeon in charge of an operation for the negligence of his assistants during the period when these assistants are under the surgeon's control, even though the assistants are also employees of the hospital. Stated differently, the "captain of the ship" concept is but the adaptation of the familiar "borrowed servant" principle in the law of agency to the operating room of a hospital.

**Id.** at 27.[6] For purposes of our review, it is necessary to ascertain whether Appellant alleged negligence on the part of any "assistants" who were under the surgeon's control.

_____

[6] In **Thomas**, our Supreme Court tracked the history of the "captain of the ship" doctrine, noting:

> [T]his doctrine was announced before the decision of this Court in **Flagiello v. Pennsylvania Hosp.**, 417 Pa. 486, 208 A. 2d 193 (1965), discarding the immunity from liability in tort previously enjoyed by public hospitals. In enunciating the "captain of the ship" theory in **McConnell** [**v. Williams**, 65 A.2d 243 (Pa. 1949)],

In his Amended Complaint, Appellant asserted a professional liability claim against Dr. Greenberg. Amended Complaint at ¶ 4. He alleged that "[a]t all times material hereto, [Dr. Greenberg] was the agent (actual, express, implied, apparent, ostensible, or otherwise), servant, and/or employee of, among others, [the Hospital] defendants and the Bornemann defendants. *Id.* at ¶ 11.

In Count II, Appellant claimed negligence against Dr. Greenberg and the Bornemann defendants. He again asserted that Dr. Greenberg was "the agent (actual, express, implied, apparent, ostensible, or otherwise), servant, and/or employee of, among others" the Bornemann defendants and the Hospital. *Id.* at ¶ 53. He contended the injuries to Decedent were the result of the negligence of Dr. Greenberg and the Bornemann defendants "acting individually or through their respective agents, ostensible agents, servants

_____

it was no coincidence that this Court noted, "if operating surgeons were not to held liable for the negligent performance of the duties of those then working under them, the law would fail in large measure to afford a means of redress for preventable injuries sustained during the course of such operations." [*Id.*] at 247. Thus, any willingness to characterize a head surgeon as the "captain of the ship" in order to financially restore the patient should be clearly negated in light of the *Flagiello* opinions. If, in fact, the residents were negligent, either the hospital or the head surgeon could be vicariously liable, depending, of course, on whether the residents were "borrowed."

*Id.*, 275 A.2d at 27.

and/or employees," in various respects. *Id.* at ¶ 54. He claimed that, "[b]y reason of the wrongful conduct of [Dr.] Greenberg, among others," Decedent sustained injuries leading to her death. *Id.* at ¶ 55.[7]

A reading of Paragraph 11 of the Amended Complaint in conjunction with the allegations of Count II indicates that Appellant alleged Dr. Greenberg was an agent of the Hospital and the Bornemann defendants, and that the Bornemann defendants were negligent based on the actions of their agents, which allegedly included Dr. Greenberg. No allegations of negligence were asserted against any agent of Dr. Greenberg.

Since January 2003, Pa.R.C.P. 1042.3(a) has required a certificate of merit in support of actions claiming a professional deviated from an acceptable professional standard. Rule 1042.3(a)(1) requires a certificate for instances of direct claims of care falling outside acceptable professional standards, while Rule 1042.3(a)(2) requires a certificate "as to the other licensed professionals for whom th[e] defendant is responsible." The purpose of Rule 1042.3(a)(2)

---

[7] In Court III, Appellant asserted similar negligence against Dr. Soumakieh and the Bornemann defendants. *Id.* at 58. He alleged that Dr. Soumakieh was "the agent (actual, express, implied, apparent, ostensible, or otherwise), servant, and/or employee of, among others" the Bornemann defendants and the Hospital. *Id.* at ¶ 58. He contended the injuries to Decedent were the result of the negligence of Dr. Soumakieh and the Bornemann defendants "acting individually or through their respective agents, ostensible agents, servants and/or employees," in various respects. *Id.* at ¶ 59. He claimed that, "[b]y reason of the wrongful conduct of [Dr.] Soumakieh, among others," Decedent sustained injuries leading to her death. *Id.* at ¶ 55.

"is to ensure that a claim of vicarious liability made against a defendant is supported by a certificate of merit. Pa.R.C.P. 1042.3(a)(2), *Note.*

Appellant filed a certificate of merit with respect to Dr. Greenberg under Rule 1042.3(a)(1) only. Certificate of Merit as to Dr. Greenberg, 6/17/10, at 1. There is no certificate of merit relating as to Dr. Greenberg asserting that anyone involved in Decedent's care was an agent of Dr. Greenberg. In other words, there is no Rule 1042.3(a)(2) certificate of merit basing claims of negligence on vicarious liability for the actions of anyone who was the agent or assistant of Dr. Greenberg.

The certificate of merit with respect to the Hospital includes the same Rule 1042.3(a)(1) assertion relating to actions on the part of the Hospital that fell outside acceptable professional standards. Certificate of Merit as to the Hospital, 6/17/10, at 1. However, the certificate also reflects a Rule 1042.3(a)(2) claim that the Hospital deviated from an acceptable professional standard "based solely on allegations from other licensed professionals for whom [the Hospital] is responsible (including [Dr. Greenberg, Dr. Soumakieh,] and all other licensed professionals at [the Hospital] who participated" in Decedent's care. *Id.* at 1-2.

Nowhere in the Amended Complaint does Appellant identify any agent or assert any negligence on the part of any agent of Dr. Greenberg. Nor is there any allegation concerning any agency relationship between Dr. Greenberg and any person or entity, other than the allegation that Dr.

- 15 -

Greenberg was the agent of the Hospital or the Bornemann defendants. Amended Complaint at ¶¶ 11 and 53-55.

As this Court reiterated in **Rachlin v. Edmison**, 813 A.2d 862 (Pa. Super. 2002), "while it is unnecessary to plead all the various details of an alleged agency relationship, a complainant must allege, as a minimum, facts which: (1) identify the agent by name or appropriate description; and (2) set forth the agent's authority, and how the tortious acts of the agent either fall within the scope of that authority, or if unauthorized, were ratified by the principal." **Id.** at 870 (quoting **Alumni Association v. Sullivan**, 535 A.2d 1095, 1100 n. 2 (Pa. Super. 1987).

As the Hospital and Bornemann observe:

[T]he text of [Appellant's] Amended Complaint did not assert a vicarious liability claim against Dr. Greenberg. [Appellant] did not allege Dr. Greenberg was any agent's principal or that anyone other than Dr. Greenberg or Dr. Soumakieh was negligent. To the extent [Appellant] now argues a vicarious liability claim against Dr. Greenberg for the conduct of Nurse Anesthetist Hoffman should have been submitted to the jury, he never alleged Nurse Anesthetist Hoffman was negligent. To the contrary, Nurse Anesthetist Hoffman is neither referenced nor described in the Amended Complaint. At trial, [Appellant] could not base a vicarious liability claim on an individual who was not alleged to be either an agent of Dr. Greenberg or negligent. **See** [**Reynolds v. Thomas Jefferson Univ. Hosp.**, 676 A.2d 1205, 1211 (Pa. Super. 1996)].

Brief of the Hospital, Dr. Greenberg, and Bornemann at 48-49. "It was abundantly clear from both the text and form of the Complaint, Amended Complaint, and the Certificate of Merit that the *sole claim asserted against Dr. Greenberg was for his personal conduct."* **Id.** at 49 (emphasis in original).

We agree. Under the circumstances, there was no basis for the trial court to give a "captain of the ship" instruction. Appellant's third and fourth claims fail. Therefore, we affirm the trial court's judgment with respect to all claims involving Dr. Greenberg.

In his final two issues, Appellant argues the trial court erred in disallowing testimony from his anesthesiology expert, Dr. Weingarten, relating to documentation errors, the negligence of "the code team" for not having a code cart available in or near the operating room, and the failure to initiate life support soon after the code was called. Again, "[t]he law is well settled that decisions regarding admission of expert testimony, like other evidentiary decisions, are within the sound discretion of the trial court. We may reverse only if we find an abuse of discretion." *Renna*, 64 A.3d at 664 (citations omitted).

As the trial court explained, the Hospital filed a motion *in limine* to exclude Dr. Weingarten from testifying as to a deviation in the standard of care based on the failure of the nurse anesthetist and Dr. Soumakieh to maintain "an accurate anesthesia record reflecting the events, which occurred beginning with the code." *See* Trial Court Opinion, 2/4/19, at 15. As the trial court correctly recognized, there is no cause of action in Pennsylvania for negligent documentation. *Id.*

Appellant contends that the testimony regarding records was not to be offered in support of a separate negligence claim but rather was to be offered

as evidence of the failure of Appellees to respond in a timely fashion when Decedent coded. However, expert testimony was not necessary to reflect that the code was recorded at 12:55 p.m. and the arrival of a code cart was documented at 1:10 p.m. As the trial court remarked, Appellant was "not precluded from raising documentation errors throughout the trial. In fact, they did so." ***Id.***

With respect to the code cart, the records show that a code cart was brought into the operating room at 1:10 p.m. However, as Dr. Soumakieh explained,

> Well, normally in a normal code they have the code cart. So, they have to bring that whenever a code happens. In my case, all that I need is – actually, it exists in the room all the time. It's in my anesthesia cart. So, I don't know if they brought a cart or not – I mean, the specific code cart or not, but whatever I needed, all these medications, I – we already have it in the room all the time in every case.

Deposition of Dr. Soumakieh, 7/15/11, at 187-88. Under the circumstances, it was irrelevant whether the code cart was brought immediately when the code was called or fifteen minutes later. Further, as the trial court recognized, Dr. Weingarten never offered an opinion with respect to lack of a code cart and Appellant did not make an offer of proof that he would testify about the lack of a cart at trial. Rather, Dr. Weingarten simply expressed his opinion that the medical personnel "failed to initiate basic life support soon after the code was called at 12:55 p.m." Weingarten Expert Report, 11/13/12, at 4.

Finally, Appellant complains that the trial court disallowed Dr. Weingarten's testimony relative to negligence and causation, as outlined in his expert report and supplemental report. The trial court dismissed the assertion as "disingenuous." Trial Court Opinion, 2/4/19, at 16. As the trial court noted, the order with regard to Dr. Weingarten "did not preclude Dr. Weingarten from offering causation opinions. It simply prohibited Dr. Weingarten from offering opinions in the form of legal conclusions by saying the phrase 'proximate cause,' the ultimate issue in the case." *Id.* As the Hospital and Bornemann recognize, the "ruling was appropriate because legal conclusions are within the purview of the trial court, not witnesses. *See Houdeshell v. Rice*, 939 A.2d 981, 985 (Pa. Super. 2007)." Brief of the Hospital, Dr. Greenberg, and Bornemann at 39-40. The trial court did not abuse its discretion with respect to any ruling regarding the expert testimony of Dr. Weingarten.

To summarize, we agree with Appellant that the trial court abused its discretion in disallowing Dr. Hornyak to offer testimony regarding the standard of care of anesthesiologist Dr. Soumakieh without developing a record through *void dire*. Therefore, we remand to the trial court for a new trial limited to claims against Dr. Soumakieh and his employer, Bornemann. On remand, the trial court shall conduct *voir dire* of Dr. Hornyak to determine whether he qualifies as an expert under Subsection 512(e) of the MCARE Act. In the event the court determines he does not qualify, Appellant shall be entitled to appeal

that determination to this Court. In the event he does qualify, the trial court shall conduct a new trial as to Dr. Soumakieh and his employer, Bornemann. In the event of such a retrial, our disposition of Appellant's issues regarding the testimony of Dr. Weingarten shall guide the conduct of the trial.

Judgments in favor of Dr. Greeneberg and the Hospital affirmed. Judgments in favor of Dr. Soumekieh and Bornemann reversed. Case remanded for proceedings in accordance with this Memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/27/2020